1  Justo Escalante, E-91258
2  CTF Central, F-Wing 302
   P.O. Box 689
3  Soledad, Ca. 93960-0689
              In Pro Se
4

5                      IN THE UNITED STATES DISTRICT COURT

6                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  Justo Escalante,
                    Petitioner,                    Case No.  *C 07-2702 JF*
9

10                                                 *TRAVERSE TO ANSWER TO PETITION*
11 v                                               *FOR WRIT OF HABEAS CORPUS*

12 J. Davis, et al.,
                    Respondent.
13 ─────────────────────────────

14 Justo Escalante, Petitioner, makes this Traverse to Respondents Answer to his petition for Writ of

15 Habeas Corpus and alleges as follows:

16        1) Paragraph number 1 is not true, Petitioner must be paroled forthwith and/or discharged from

17 custody due to the amount of time now incarcerated combined with good time credits;

18        2) Paragraph number 2 is true;

19        3) Paragraph number 3 is not true, Petitioner exercises his right to maintain his innocence

20 regarding the description of events in said paragraph;

21        4) Paragraph number 4 is not true to the accuracy of prior criminal history and refers the Court to

22 the attached Probation Officers Report at page 4 attached hereto as Exhibit G;

23        5) Paragraph number 5 is not true as to unstable social history, but Petitioner admits as true to

24 prior substance usage that occurred over 17 years ago;

25        6) Paragraph number 6 is true;

26        7) Paragraph number 7 is true;

27        8) Paragraph number 8 is true, however, Petitioner denies the description of events as to

28 Petitioner's alleged involvement;

                                              1

1    9) Paragraph number 9 is true;

2    10) Paragraph number 10 is true only to the extent remedies were exhausted, as to the rest

3    Petitioner denies;

4    11) Paragraph number 11 is not true, Petitioner has a federally protected liberty interest in

5    receiving a firm parole date;

6    12) Paragraph number 12 is not true;

7    13) Paragraph number 13 is not true;

8    14) Paragraph number 14 is not true;

9    15) Paragraph number 15 is not true;

10    16) Paragraph number 16 is not true, said denial violates the AEDPA;

11    17) Paragraph number 17 is not true;

12    18) Paragraph number 18 is true;

13    19) Paragraph number 19 is not true;

14    20) Paragraph number 20 is not true;

15    21) Paragraph number 21 is not true;

16    22) Petitioner incorporates by reference and resubmits his Writ of Habeas Corpus as if fully set

17    forth herein, and;

18    23) Petitioner also incorporates by reference the Memorandum of Points and Authorities herein

19    and Exhibits attached hereto in support of his Traverse.

20    *WHEREFORE*, Petitioner respectfully requests that the Court grant the petition for Writ of Habeas

21    Corpus.

22

23

24    Date:                                             Submitted by:

25

26    _____

27                                                      Justo Escalante, In Pro Se

28

2

1 | Justo Escalante, E-91258
CTF Central, F-302
2 | P.O. Box 689
Soledad, Ca. 93960-0689
3 |       In Pro Se

4

5

6

7

8 | **IN THE UNITED STATES DISTRICT COURT FOR**

9 | **THE NORTHERN DISTRICT OF CALIFORNIA**

10

11

12 | Justo Escalante,

13 |       Petitioner               Case No.    *C 07-2702 JF*

14

15 | v                       *MEMORANDUM OF POINTS AND*

16 |                       *AUTHORITIES IN SUPPORT OF TRAVERSE*

17 |                       *TO ANSWER TO PETITION FOR WRIT OF*

18 | J. Davis, et al.,               *HABEAS CORPUS*

19 |       Respondents.

20

21

22

23

24

25

26

27

28

i

# TABLE OF CONTENTS

I   INTRODUCTION ................................................................. 1

II  THE APPLICABLE "SOME EVIDENCE" STANDARD  ............................................. 1
AND "LIBERTY INTEREST" MANDATING AN
"EXPECTATION IN RECEIVING A PAROLE DATE"
AT SAID HEARINGS

III UNDER THE AEDPA USE OF THE COMMITMENT OFFENSE  ............................ 5
FOR THE FOURTH TIME TO DENY PAROLE VIOLATES
CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED
BY THE SUPREME COURT UNDER GREENHOLTZ v INMATES
OF NEBRASKA PENAL and CORRECTIONAL COMPLEX,
442 U.S. 1 (1979); BOARD OF PARDONS v ALLEN, 482 U.S. 369
(1987); LANKFORD v IDAHO, 500 U.S. 110 (1979) and
SUPERINTENDENT v HILL, 472 U.S. 445 (1985)

a)  Use Of The Historical Facts Surrounding The Commitment  ........................................ 5
Offense For The Fourth Time To Deny Parole Violates Due
Process Of Law And Is An Unreasonable Application Of
Federal Law

b)  The Offense Did Not Rise To The Level Of  ................................................... 11
"Particularly Egregious" Nor "Especially Callous"
To Deny Parole For The Fourth Time Violating
Due Process Of Law

IV THE BOARD VIOLATED DUE PROCESS OF LAW WHEN  ..................................... 15
IT FAILED TO SHOW PETITIONER *"CURRENTLY"* POSES
AN UNREASONABLE RISK OF DANGER IF RELEASED;
THERE WAS NO EVIDENCE UNDER THE LAW TO SUPPORT
A LACK OF VOCATIONAL/SELF-HELP FINDING

a)  Ordering Self Help Specifically To Address The Issue  ........................................ 16
Of Insight Into The Commitment Offense Violates
Petitioner's Due Process Rights As A Factor To Deny Parole

b)  There was No Evidence Showing Petitioner Not Obtaining  ............................................ 20
A Vocation Show's Petitioner *"Currently"* Poses An Unreasonable
Risk Of Danger If Paroled

CONCLUSION ................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**                                                                    Pages

1  Biggs v Terhune (9th Cir. 2002) ............1,2,3,4,6,7,10,11,12,15,16,20,21
2  334 F.3d 910
   Board of Pardons v Allen (1987) ...........................................2,3
3  482 U.S. 369
   Bowman Trans v Arkansas-Best Freight (1974) ...............................22
4  419 U.S. 281, 42 L.Ed.2d 447
   Carey v Musladin (2006) ...................................................2,3
5      ___ U.S. ___, 127 S.Ct. 649
   Edward v Balisok (1997) ................................................... 4
6  520 U.S. 641
   Garcia v Carey (9th Cir. 2005) ............................................ 5
7  395 F.3d 1099
   Greene v Lambert (9th Cir. 2002) .......................................... 5
8  288 F.3d 1088
   Greenholtz V Nebraska Penal Complex (1979) ............................... 2,3
9  442 U.S. 1
   In re Andrade (2006) ..................................................... 21
10 141 Cal.App.4th 807, 46 Cal.Rptr. 3d 317
   In re Baker (2007) .......................... 4,9,10,11,12,14,16,19,20
11 In re Casewell (2001) ................................................. 17,22
   92 Cal.App.4th 1017
12 In re Cooper (2007) ................................................... 4,8,16
   153 Cal.App.4th 1043
13 In re Dannenberg (2002) ............................................... 17
   125 Cal.Rptr.2d 458
14 In re Dannenberg (2005) ............................................ 6,13,18
   34 Cal.4th 1061
15 In re Dannenberg (2007) ............................................... 10,21
       Cal.App.4th ___, DJDAR 17131
16 In re Deluna (2005) ................................................... 17
   125 Cal.App.4th 585, 24 Cal.Rptr.3d 643
17 In re Elkins (2006) ............................... 1,8,9,12,13,14,21
   144 Cal.App.4th 475
18 In re Grant (1976) .................................................... 6,11
   18 Cal.3d 1 15
19 In re Jeanice D (1980) ................................................ 11
   28 Cal.3d 210
20 In re Lawrence (2007) ................................... 1,8,9,16,21
   150 Cal.App.4th 1511
21 In re Lee (2006) ......................................... 1,4,8,9,16,21
   143 Cal.App 4th 1400
22 In re Montgomery (2007) ............................................. 14-15
   DJDAR 16717
23 In re Morall (2002) .................................................... 4
   102 Cal.App.4th 280, 125 Cal.Rptr.2d 391
24 In re Ramirez (2001) ............................................... 4,14,19
   94 Cal.App.4th 549
25 In re Roderick (2007) ................................................ 20
       Cal.App.4th ___, 2007 DJDAR 12575
26 In re Rosenkrantz (2002) ......................... 4,9,10,11,12,15,17,18
   29 Cal.4th 616
27 In re Scott (2004) ............................................ 3,16,17,19
   119 Cal.App.4th 871
28 In re Scott (2005) ............................................... 9,10,14
   133 Cal.App.4th 573

## TABLE OF AUTHORITIES CONTINUES

| Cases | Pages |
|---|---|
| In re Smith (2003) ............................................ 10,14,22 | |
| 109 Cal.App.4th 489 | |
| In re Smith (2003) ............................................ 1,8,21 | |
| 114 Cal.App.4th 343 | |
| In re Weider (2006) ........................................... 1,8,21 | |
| 145 Cal.App.4th 570 | |
| Irons v Carey (9th Cir. 2007) .............. 2,3,6,8,10,11,14,19,20,22 | |
| 479 F.3d 658 | |
| Lankford v Idaho (1991) ...................................... 4 | |
| 500 U.S. 110 | |
| Lockyer v Andrade (2003) ..................................... 5 | |
| 123 S.Ct. 1041 | |
| Martin v Marshall (N.D. Cal. 2006) ........................... 8,10,11 | |
| 431 F.Supp.2d 1038 | |
| Mc Quillion v Duncan (9th Cir. 2003) ....... 1,2,3,4,6,7,10,11,12,15,16,20,21 | |
| 306 F.3d 895 | |
| Miller-El v Cockrell (2003) .................................. 5 | |
| 123 S.Ct. 1029 | |
| Penetti v Quanterman (2007) .................................. 3 | |
| U.S._____, 127 S.Ct. 2842 | |
| Rosenkrantz v Marshall (C.D. Cal. 2006) ...................... 7,8 | |
| 444 F.Supp.2d 1063 | |
| Sanchez v Kane (C.D. Cal. 2006) .............................. 8 | |
| 444 F.Supp.2d 1049 | |
| Sass v California Board of Prison Terms (9th Cir. 2006) ...... 2,3,7 | |
| 461 F.3d 1123 | |
| Superintendent v Hill (1985) ................... 1,2,3,4,6,8,9,15,17,18,20,22 | |
| 475 U.S.445, 105 S.Ct. 2768, 86 L.Ed.2d 356 | |
| Williams v Taylor (2000) ..................................... 5 | |
| 529 U.S. 362 | |
| Willis v Kane (N.D. Cal. 2007) ............................... 8,19 | |
| 485 F.Supp.2d 1126 | |
| Yee v Duncan (9th Cir. 2006) ................................. 5 | |
| 441 F.3d 851 | |

### California Code Of Regulations, Title 15

| | |
|---|---|
| 2402 ........................................................ 15,18 | |
| 2402(a) ..................................................... 18 | |
| 2402(c) ..................................................... 15,17 | |
| 2402(c)(1)(C) ............................................... 6,13 | |
| 2402(c)(1)(6) ............................................... 20 | |
| 2402(c)(5) .................................................. 18 | |
| 2402(b) ..................................................... 15 | |
| 2402(c)(1)(B) ............................................... 6,12 | |
| 2402(c)(1)(D) ............................................... 6,12 | |
| 2402(d)(8) .................................................. 20,21 | |

### California Penal Codes

| | |
|---|---|
| 3041 ........................................................ 15,17,20 | |
| 3041(b) ..................................................... 17 | |
| 5011(b) ..................................................... 17,18 | |

I

## INTRODUCTION

Petitioner's habeas and Traverse alleges constitutional violations that occurred at Petitioner's 4th parole hearing held by the Board of Prison Hearings (Board) on December 15, 2005. The Board, for the 4th time, denied petitioner parole who is serving a seven (7) year to life sentence for a conviction of "aggravated mayhem," a parolable offense, that occurred in 1990. Petitioner's minimum eligible parole date for release has passed since May 29, 1998. (Exhibit A at 1:15-20).

The last reasoned denial to uphold Petitioner's parole denial was authored by the California Superior Court for the County of Los Angeles which denied relief based on (1) the commitment offense and conduct prior to imprisonment, (2) self help, (3) vocational programming and (4) a psychological report indicating petitioner denies responsibility for the offense. (Exhibit B at 2). A decision that was not supported by "some evidence" that contained "an indicia of reliability" showing Petitioner "*CURRENTLY*" posed an unreasonable risk of danger if paroled. (Superintendent v Hill, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); McQuillion v Duncan, 306 F.3d 895, 904 (9th Cir. 2002); Biggs v Terhune, 334 F.3d 910, 915 (9th Cir. 2003); In re Smith, 114 Cal.App.4th 343, 370, 372 (2003) [evidence must show "that a prisoner *currently* poses an unreasonable risk of danger if released at this time]; In re Elkins, 144 Cal.App.4th 475, 499 (2006) [facts must show Petitioner "*currently* poses an unreasonable risk of danger]; In re Weider, 145 Cal.App.4th 570, 589 (2006) ["[T]he over arching consideration in the suitability determination is whether the inmate is *currently* a threat to public safety"]; In re Lawrence, 150 Cal.App.4th 1511, 59 Cal.Rptr.3d 537, 573-574 (2007) [evidence must show a "perpetrator's *present* dangerousness if released to the public world"]; In re Lee, 143 Cal.App.4th 1400, 1414 (2006) ["to deny parole, the reason must relate to a defendants *continued* unreasonable risk to public safety"]; In re Cooper, 153 Cal.App.4th 1043, 1066-1067 (2007) ["absence of any evidence that [Cooper] is a *current* danger to society if released"]).

II

## THE APPLICABLE "SOME EVIDENCE" STANDARD AND "LIBERTY INTEREST" MANDATING AN "EXPECTATION IN RECEIVING A PAROLE DATE" AT SAID PAROLE HEARINGS

1    The state alleges three issues in their Answer: (1) a California life prisoner has no federally

2    protected interest in parole; (2) due process does not require a parole decision to be supported by any

3    evidence; and (3) the state's court holding that the decision was supported by some evidence was not an

4    unreasonable application of federal law under the Anti-Terrorism Effective Death Penalty Act (AEDPA).

5    (Respondent's Answer at 1-16).

6        The state's first two contentions have already and repeatedly been rejected by the Ninth Circuit

7    Court of Appeals. (See, Irons v Carey, 479 F.3d 658, 662 (9th Cir. 2007); Sass v California Board of

8    Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v Terhune, 334 F.3d 910, 914 (9th Cir. 2003);

9    McQuillion v Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

10       To the extent that the state's discussion of Carey v Musladin, _____ U.S. _____, 127 S.Ct. 649

11   (2006) (Answer at 10-11) is meant to suggest that there is now some question about the continued

12   viability if Irons, Sass, Biggs and McQuillion, it ignores that Irons reaffirmed the liberty and evidence

13   holdings of Sass, Biggs and McQuillion *after* Musladin was decided. Moreover, nothing in Musladin

14   raises any questions about the continued viability of this line of cases. Musladin held only that a

15   test created to determine prejudice resulting from private conduct, especially since the test included

16   consideration of whether the conduct furthered an essential state interest, a factor that would never be

17   present in considering private conduct. (127 S.Ct. at 653-654).

18       Nothing in Irons, Sass, Biggs or McQuillion required this Court to expand a Supreme Court

19   holding to a new actor for whom the holding was never intended. In Greenholtz v Nebraska Penal

20   Complex, 442 U.S. 1 (1979), and Board of Pardons v Allen, 482 U.S. 369 (1987), the Supreme Court

21   expressly held that statutes which mandates parole except under specified circumstances give prisoners

22   a federally protected liberty interest in parole; an application of that rule to the California parole statute

23   results in the holdings of Irons and the other cases that California life prisoners have a liberty interest in

24   parole. And in Superintendent v Hill, 472 U.S. 445 (1985), the Supreme Court held that "in a variety of

25   contexts" a governmental decision resulting on the loss of an important liberty interest must be supported

26   by some evidence. In light of such express, on-point holdings by the Supreme Court, it is absurd to

27   contend that settled Supreme Court authority does not control in this case of that Musladin has any

28   bearing on this case. Biggs, Sass and Irons discuss the applicability of the "some evidence" of the

1  settled Supreme Court authority announced in <u>Superintendent v Hill</u>, <u>Greenholtz</u>, and <u>Allen</u>.  The fact

2  that any case raising an issue of whether evidence supports the decision will be based on the unique facts

3  of the case does not mean relief is precluded under the AEDPA.

4          Furthermore, the Supreme Court recently explained the rule of federal precedent, federal review

5  of state court decisions and impact of AEDPA in <u>Panetti v Quarterman</u>, _____ U.S. _____, 127 S.Ct.

6  2842 (2007). In <u>Panetti</u>, the Supreme Court explained:

7          "AEDPA does not 'require state and federal courts to wait for some earlier identical
           fact pattern before a legal rule must be applied.' Carey v Musladin, 549 U.S. _____,
8          _____, 127 S.Ct. 649, 656 (2006) (slip op., at 2) (Kennedy, J., concurring in judgment.)
           Nor does AEDPA prohibit a federal court from finding an application of a principle
9          unreasonable when it involves a set of facts different than those of the case in which
           the principle announced. [citation omitted]. The statute recognizes that, to the contrary,
10         even a general standard may be applied in an unreasonable manner."
           (<u>Panetti</u>, <u>supra</u>, 127 S.Ct. at 2858).
11

12  As such, the Court in <u>McQuillion</u>, <u>supra</u>, 306 F.3d at 904, held that in the parole context under the

13  AEDPA, that the "some evidence" standard announced in <u>Superintendent v Hill</u>, <u>supra</u>, applies to

14  California parole hearings. Therefore, not only has the Ninth Circuit held that <u>Greenholtz v Inmates of</u>

15  <u>Nebraska Penal & Correc. Complex, supra</u>, is the governing cases when reviewing parole hearing claims

16  under AEDPA, but also <u>Superintendent v Hill</u> applies as well. (<u>McQuillion</u>, <u>supra</u>, 306 F.3d at 901, 904;

17  <u>Biggs</u>, <u>supra</u>, 334 F.3d at 914-915; <u>Sass</u>, <u>supra</u>, 461 F.3d at 1128-1129; <u>Irons</u>, <u>supra</u>, 479 F.3d at 662-

18  663).

19          Respondent's idea that Petitioner need only be provided an opportunity to be heard and a

20  decision informing him why he did not qualify for prole is not the law. (Answer at 9:11-15, 10:5-8, 11:

21  15-21). Under the "some evidence" standard, that "some evidence" must have "an indicia of reliability"

22  to support the reasons to deny parole and furthermore can not and must not be applied in a fashion that

23  would "convert a court reviewing the denial of parole into a potted plant." (<u>Biggs</u>, <u>supra</u>, 334 F.3d at

24  915; <u>McQuillion</u>, <u>supra</u>, 306 F.3d at 904; <u>In re Scott</u>, 119 Cal.App.4th 871, 898-899 (2004). As such, the

25  California courts have explained that under  the "some evidence" standard:

26         "The test in reviewing the Board's decision denying parole *is not* whether some
27         evidence supports the reasons [the Board] cites for denying parole,  but whether

28

3

1    some evidence indicates a parolee's release unreasonably endangers public
     safety. [Citations]. Some evidence of the existence of a particular factor
2    *does not necessarily equate to some evidence the parolee's release unreasonably
     endangers public safety.*" (In re Barker, 151 Cal.App.4th 346, 366 (2007);
3    In re Lee, 143 Cal.App.4th 1400, 1408 (2006) [same]; In re Cooper, 153 Cal.App.4th
     1043, 1060 (2007) [same]).
4

5    While the "some evidence standards provide the standard of evidentiary sufficiency for the due process,

6    it is not a substitute for other established due process requirements." (In re Ramirez, 94 Cal.App.4th 549,

7    563-564 (2001), citing Superintendent v Hill, supra, and Edwards v Balisok, 520 U.S. 641, 648 (1997)).

8    As stated in In re Morrall, 102 Cal.App.4th 280, 125 Cal.Rptr.2d 391, 406 (2002):

9         "An inmate is entitled to due consideration of an application for parole and
          that is 'something more than a mere pro forma consideration.' (In re Sturm,
10        11 Cal.3d at 268). *Nominal compliance with procedural requirements would
          ensure nothing more than a pro forma consideration ....*"
11
          Petitioner has an "expectation that [he] will be granted parole," (In re Rosenkrantz, 29 Cal.4th
12
     616, 654 (2002)), and has a "protected liberty interest under California due process claims." (Id.;
13
     McQuillion, supra, 306 F.3d at 901-903 [same]; Biggs, supra, 334 F.3d at 915-916 [same]; Sass, supra,
14
     461 F.3d at 1128 [same]; Irons, supra, 479 F.3d at 662 [same]). As well as the application of federal
15
     law, Petitioner has the right to "freedom from confinement in accordance with the substantive criteria
16
     established by the state law that would require release," (McQuillion v Duncan, 342 F.3d 1012, 1014
17
     (9th Cir 2003), and a parole hearing conducted in "accordance with the applicable legal standards."
18
     (Ramirez, supra, 94 Cal.App.4th at 561 [citations omitted]). In addition, the governing United States
19
     Supreme Court authority under AEDPA when reviewing constitutional due process violations, the Court
20
     in Lankford v Idaho, 500 U.S. 110, 121 (1991), wrote:
21
          "[D]ue process is not a mechanical instrument. It is not a yardstick. It is a
22        process. It is a delicate process adjustment inescapably involving the
          exercise of judgment by those whom the constitution entrusted with the
23        unfolding process."

24        Thus, when evaluating "due process" violations under the AEDPA, the United States Supreme

25   Court in Lankford gave the lower federal courts *full* "exercise of judgment by those whom the

26   Constitution entrusted with the unfolding of the process" in determining what violates due process

27   of law, which includes due process violations occurring during parole hearings. (Biggs, supra, 334 F.3d

28   at 916-917).

                                              4

1       Lastly, under the rule of "deference" to state court decisions, the rule of deference is not a rule

2   of infallibility of a state court ruling. "Even in the context of federal habeas, deference does not imply

3   abandonment of abdication of judicial review. Deference does not by definition preclude relief." (Miller-

4   El v Cockrell, 123 S.Ct. 1029, 1041 (2003)). Miller-El confirms that the AEDPA modified, but does not

5   eliminate the comity balance inherent in the habeas framework. Deference to decisions of state courts

6   end precisely where courts fail to apply federal law in an objectively reasonable way. (See, Lockyer v

7   Andrade, 123 S.Ct. 1166, 1173 (2003)). Reasonable application in every case *is not presumed*. (See,

8   Miller-El, supra, 123 S.Ct. at 1041). The mere fact that the state court rejected a claim does not mean

9   ipso facto that the rejection constituted a reasonable application of federal law. (Id.; see also, William v

10  Taylor, 529 U.S. 362 (2000)).

11  

### III

**UNDER THE AEDPA USE OF THE COMMITMENT OFFENSE
FOR THE FOURTH TIME TO DENY PAROLE VIOLATES CLEARLY
ESTABLISHED FEDERAL LAW AS DETERMINED BY THE
SUPREME COURT UNDER GREENHOLTZ v INMATES OF
NEBRASKA PENAL and CORRECTIONAL COMPLEX, 442 U.S. 1
(1979); BOARD of PARDONS v ALLEN, 482 U.S. 369 (1987);
LANKFORD v IDAHO, 500 U.S. 110 (1979) and SUPERINTENDENT
v HILL, 472 U.S. 445 (1985)**

18      In addressing Petitioner's claims herein, this Court must consider only the reasoning of the

19  Superior Court of California for the County of Los Angeles, which issued the last written decision

20  addressing them, (Yee v Duncan, 441 F.3d 851, 856 (9th Cir. 2006); Garcia v Carey, 395 F.3d 1099,

21  1103 n.7 (9th Cir. 2005)), and must therefore independently review the record to determine whether the

22  Los Angeles County Superior Court's findings were objectively unreasonable under 28 U.S.C. §2254

23  (d). (See, Greene v Lambert, 288 F.3d 1081, 1088-1089 (9th Cir. 2002); Exhibit B).

24  **a) Use Of The Historical Facts Surrounding The
     Commitment Offense For The Fourth Time To Deny

25     Parole Violates Due Process Of law And Is An

26     Unreasonable Application Of Federal Law**

27      At the time of Petitioner's fourth parole hearing, he had served 15 years of incarceration and as

28  of today has served 17 years of his seven (7) to life sentence, surpassing his minimum eligible release

1  date of May 29, 1998. Even at the time of petitioner's 2005 parole hearing, he had by far "served the

2  minimum number of years required by his sentence." (Irons v Carey, 479 F.3d 658, 665 (9th Cir. 2007);

3  In re Grant, 18 Cal.3d 1, 15 (1976) [noting seven year period of ineligibility for life prisoners sentenced

4  to seven (7) years to life]). After review of the entire record of the December 15, 2005, parole hearing,

5  the Superior Court of Los Angeles upheld some of the reasoning by the Board to deny parole while

6  rejecting other reasoning by the Board to deny parole, the Court wrote:

> "The court finds that there is no evidence to support the Board's findings that
> the commitment offense was 'dispassionate and calculated,' such as an execution
> style murder (see Cal. Code regs., tit. 15 §2402, subd. (c)(1)(B)) and that the
> 'offense was carried out in a manner that demonstrates an exceptional callous
> disregard for human suffering' (see Cal. Code Regs., tit. 15 §2402 subd. (c)(1)(D)).
> Although there is no evidence to support the Board's specific findings regarding
> the commitment offense, the court nevertheless finds that there is some evidence
> that the commitment offense was one in which the victim was abused, defiled or
> mutilated during or after the offense. (See Cal. Code Regs., tit. 15 §2402, subd.
> (c)(1)(C)). 'We may uphold the [Board's] decision, despite a flaw in its findings,
> if the authority has made clear it would have reached the same decision even
> absent the error.' (In re Dannenberg (2005) 34 Cal.4th 1061, 1100.) Based on the
> fact that the Board's discussion of the commitment offense cited to petitioner
> hitting, kicking and knocking the victim to the ground before stabbing him,
> the court concludes that the Board's mistake does not invalidate its decision to
> deny parole based on the commitment offense." (Exhibit B at 2:6-19).

16    Under the "some evidence" standard announced in Superintendent v Hill, supra, 472 U.S. at

17  457, this Court recently determined that repetitive use of the commitment offense and conduct prior to

18  imprisonment to deny parole in light of exemplary behavior during incarceration and when the parole

19  applicant surpasses his minimum number of years to be served indicates a violation of due process.

20  (Irons, supra, 479 F.3d at 664-665). The Court wrote:

> "In Biggs [v Terhune,  334 F.3d 910 (2003)] ... we made clear that '[a] continued
> reliance in the future on an unchanging factor, the circumstances of the offense
> and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused
> by the prison system and could result in a due process violation.' Id. at 916-917.
> Specifically, we held that a parole Board's sole ... reliance on the gravity of the
> offense and conduct prior to imprisonment to justify denial of parole can initially
> be justified as fulfilling the requirements set forth by state law. Over time, however,
> should Biggs continue to demonstrate exemplary behavior and evidence of
> rehabilitation, denying him a parole date simply because of the nature of Biggs
> offense and prior conduct would raise serious questions involving his liberty
> interest in parole.
>
> ¶ We note that ... in cases in which we have held that a parole Board's decision to
> deem a prisoner unsuitable for parole solely on the basis of his commitment offense

6

comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Bigg's, Sass, and here, the petitioner's had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125. All we hold today, therefore, is that, given the particular circumstances of the offense in these cases, due process was not violated when those prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

¶ [I]ndefinite detention based solely on an inmate's commitment offense, *regardless of the extent of his rehabilitation*, will at some point *violate due process*, given the liberty interest in parole that flows from the relevant California statutes. Biggs, 334 F.3d at 917." (id. at 664-665).

In Petitioner's case he has far surpassed his minimum number of years required by his minimum sentence of seven years (7) in which at the time of his 2005 parole hearing, he had served 15 years (17 years as of today). As to Petitioner's post-conviction behavior, while petitioner entered prison not fluent in the English language, Petitioner managed to obtain his G.E.D., participate in the Anger Management program as well as the Impact program and regular attendance in both Alcoholic and Narcotics Anonymous. (Exhibit A at 35:14-24, 36:8-23). As best summed up by the Board:

"[W]e would like to take this opportunity to *commend* you for not having received any 115s throughout the entire time you have been incarcerated. That's very *commendable*. We understand that it can be very difficult for you to maneuver in these shark-infested waters within the institution without incurring any 115s, so we certainly *commend* you for having the ability and the skill not to incur any disciplinaries while within the institutions. Sir, we'd also like to *commend* you for the multiple laudatory chronos in your file as well as for your continued participation in AA, NA ...." (Exhibit A at 52:12-26).

"You got your GED in 2000, and we certainly *commend* you for that, and we recognize that until you either get your GED or reach a certain grade point average that they won't consider you for vocations, so we understand that." (Exhibit A at 53:20-26).

Petitioner should not have merely been "*commended*" for his exemplary post conviction record, as the united States Supreme Court has recognized:

"[T]he behavior of an inmate during confinement is ***critical*** in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release." (Greenholtz, supra, 442 U.S. at 15; Rosenkrantz v Marshall, 444 F.Supp.2d 1063, 1086 (C.D. Cal. 2006) [same]).

Such is the case herein, other than the pre-commitment factors, to include the commitment offense, used four times now to deny parole, the Board simply comes to an opposite conclusion than

1   the Supreme Court's determination that Petitioner's behavior "during confinement is *critical*,"

2   concluding that the 15 year old circumstances surrounding the commitment offense at the time of his

3   2005 parole hearing (now 17 years as of today), warrant a denial of parole for the fourth time despite the

4   legal criteria mandating the Board to present "some evidence" that contains "an indicia of reliability"

5   showing Petitioner "*currently*" presents an unreasonable risk of danger if paroled. (Hill, supra, 472 U.S.

6   at 457; Biggs, supra, 334 F.3d at 915; McQuillion, supra, 306 F.3d at 904; Smith, supra, 114 Cal.App.4th

7   at 370, 372 [evidence must show "that a prisoner *currently* would pose an unreasonable risk of danger

8   if released at this time"]; Lee, supra, 143 Cal.App.4th at 1414 [same]; Elkins, supra, 144 Cal.App.4th

9   at 499 [same]; Weider, supra, 145 Cal.App.4th at 589 [same]; Cooper, supra, 153 Cal.App.4th at 1066-

10   1067 [same]; Lawrence, supra, 59 Cal.Rptr.3d at 573-574 [same]).

11        In line with the reasoning in Irons, supra, under the Hill "some evidence" standard, the federal

12   district court's in Willis v Kane, 485 F.Supp.2d 1126, 1127, 1133-1135 (N.D. Cal. 2007) [murder

13   of child in which crime described as an "horrendous crime," repeatedly denial of parole based on

14   the circumstances surrounding the commitment offense violates due process, citing Irons, supra];

15   Rosenkrantz v Marshall, 444 F.Supp.2d 1063, 1072-1073, 1080-1087 (C.D. Cal. 2006) [premeditated

16   murder of unarmed victim shot ten times, including six shots to the head, repetitive denials based

17   on circumstances surrounding the commitment offense violated due process]; Sanchez v Kane, 444

18   F.Supp.2d 1049, 1051-1052, 1062-1063 (C.D. Cal. 2006) [gangland slaying of misidentified citizen

19   as rival gang member, repetitive use of the circumstances surrounding the commitment offense for the

20   third time violated due process]; Martin v Marshall, 431 F.Supp.2d 1038, 1040, 1047 (N.D. Cal. 2006)

21   [double homicide and shooting of bystander, repetitive denials of parole based on the circumstances

22   surrounding the commitment offense when defendant "has surpassed his minimum sentence" violates

23   due process] and Johnson v Finn, 2006 WL 195159 at *8-12, recommendation adopted at 2006 WL

24   2839910 (E.D. Cal. Sept. 29, 2006) [execution style murder and attempted murder, repetitive use of

25   the circumstances surrounding the commitment offense violates due process], as in Irons, supra, that

26   when a parole applicant surpasses his minimum number of years to be served, that continued reliance

27   on the commitment offense and conduct prior to imprisonment in light of exemplary behavior during

28   incarceration violates due process of law, Petitioner's "liberty interest" in receiving a parole date and is

1 | not "some evidence" under Hill, to support a denial of parole. (Irons, supra, 479 F.3d at 662, 665;

2 | McQuillion, supra, 306 F.3d at 902 ["presumption that parole release will be granted"]; Rosenkrantz,

3 | supra, 29 Cal.4th at 654, 661 ["liberty interest in release on parole" and "expectation that [Petitioner]

4 | will be granted parole"]).

5 |     Even California court's have held that continued reliance on the commitment offense and

6 | conduct prior to imprisonment to deny parole violates due process:

7 |           "The commitment offense is one of only two factors indicative of unsuitability
           a prisoner cannot change *(the other being his 'Previous Records of Violence')*.
8 |           Reliance on such an immutable factor 'without consideration of subsequent
           circumstances' may be unfair [citation], and 'runs contrary to the rehabilitative
9 |           goals espoused by the prison system and could result in a due process violation.'
           [Citation]. The commitment offense can negate suitability only if circumstances
10 |          of the crime reliably established by evidence in the record rationally indicate
           that the offender will present an unreasonable public safety risk if released from
11 |          prison. Yet the commitment offense may be very questionable after a long period
           of time." (In re Elkins, 144 Cal.App.4th 475, 496 (2006), citing In re Scott,
12 |          133 Cal.App.4th 573, 594-595 (2005); In re Lee, 143 Cal.App.4th 1400, 1412
           (2006) [same]; In re Barker, 151 Cal.App.4th 346, 372 (2007) [same]).
13 |

14 |     In Elkins, supra, that case involved the first degree murder and robbery conviction of Elkins for

15 | pounding a defenseless victim in the head numerous times with a baseball bat until the victim died in the

16 | course of a robbery. (id. at 144 Cal.App.4th at 481). Elkins was "severely addicted to drugs and alcohol"

17 | and "was on probation for burglary and had a pending charge of grand theft" at the time he committed

18 | the murder. (id. at 481-482). The Board described the offense as "an extremely, extremely vicious

19 | crime. Vicious crime." (id. at 483). Relying on California case law and federal case law, the Court held

20 | that repetitive use of the offense and conduct prior to imprisonment to deny Elkins parole violated due

21 | process of law and thereafter granted habeas relief. (id. at 498-502).

22 |     In In re Lawrence, 150 Cal.App.4th 1511, 59 Cal.Rptr.3d 537 (2007), Lawrence was convicted

23 | of first degree murder and was denied parole based on the victim being "stabbed ... multiple times"

24 | and shooting the victim "four times." (id. at 548). However, the Court granted habeas relief due to the

25 | repetitive use of the offense and pre-commitment factors to deny parole writing:

26 |           "Combining the California and federal standards of review, as they have been
27 |           articulated thus far by the California supreme Court and the Ninth Circuit,
           respectively, the commitment crime can lack the power to supply 'some evidence'
28 |

9

1       supporting a denial of parole because of the interplay between two factors -- the
2       nature of that crime and the passage of time since its commission. That is, the
      fact that there is 'some evidence' *the crime was committed and committed in*
3       *a certain way* at a certain time *does not mean that crime necessarily represents*
      *'some evidence' the prisoner's release on parole will pose an unreasonable risk*
4       *of danger to the public safety at the present time."* (id. at 558).

5

6 Lawrence relied on federal case law (Biggs, Sass, Irons, Rosenkrantz and Martin, supra; id. at 553-

7 557, 567-569, 573), and state case law (In re Smith, 109 Cal.App.4th 489 (2003); In re Scott, 133

8 Cal.App.4th 573 (2005); Lee, Weider and Elkins, supra,; id. at 562-567, 573), to support the above

9 quoted text to grant relief.

10      Also, in In re Dannenberg, _____ Cal.App.4th _____, 2007 DJDAR 17131_____, ____17136____

11 (2007), the Court recently held that while Dannenberg beat his wife in the head with a pipe-wrench

12 and thereafter placed her head in a tube of water drowning her, held that "while there is some evidence

13 that Dannenberg's commitment offense was 'especially heinous,' when measured against the minimum

14 elements of second degree murder, the Governor's decision [to deny parole] violates due process

15 because there is no longer any evidence that, solely due to the nature of Dannenberg's offense he

16 *currently* poses an unreasonable risk of danger to society."

17      Finally, In re Barker, supra, a case involving Barker *convicted for a triple homicide* in which

18 one of his victims, a 76 year old grandfather, Barker pounded the grandfather in the head "four times"

19 with a chisel and thereafter "shot him twice in the head." (id. 151 Cal.App.4th at 352-353). Even

20 though the California Court of Appeals held that "the crimes Barker committed and for which he was

21 convicted were horrific, resulting in the senseless death of three people," (id. at 3770, the Court granted

22 habeas relief relevant to it's quotation of the "predictive value of the commitment offense may be very

23 questionable after a long period of time." (id. at 372,'378).

24      What the above cited cases evidence, cases that involved the most heinous single, double and

25 triple murders which all resulted in life imprisonment sentences, compared to Petitioner's conviction

26 of a non-homicide offense, is that once a parole applicant surpasses his minimum number of years to

27 be served, has shown exemplary behavior during incarceration, but in light of the aforementioned, the

28 board continues to rely on the commitment offense and conduct prior to imprisonment to deny parole,

1    is not "some evidence" to deny parole and violates due process of law. (Irons, supra, 479 F.3d at 664-

2    665). Especially in light of petitioner receiving a seven (7) year to life sentence, a minimum eligible

3    release date of May 29, 1998, serving 15 years at the time of his 2005 parole hearing at which time

4    petitioner surpassed "his minimum number of years required by his sentence" (17 years of incarceration

5    as of today), *has now surpassed the minimum time to be served for those convicted of second degree*

6    *murder* and sentenced to 15 years to life and as of today has *surpassed the minimum number of years*

7    *to be served by those convicted of first degree murder* and sentenced to 25 years to life. (See, In re

8    Jeanice D., 28 Cal.3d 210, 220 n.10 (1980) [second degree murder sentenced to 15 years to life eligible

9    for parole after serving "*10 years*" and those convicted of first degree murder and sentenced to 25 years

10   to life eligible for parole after serving "*16 years and 8 months*"]; Grant, supra, 18 Cal.3d at 15 [seven

11   year period of ineligibility to prisoner sentenced to seven (7) years to life]; Exhibit A at 1).

12        Therefore, in accordance with the aforementioned law, the Board's use of Petitioner's

13   commitment factors which include conduct prior to imprisonment to deny parole for the fourth time,

14   violated due process of law. [1/]

15   **b) The Offense Did Not Rise To The Level Of**
     **"Particularly Egregious" Nor "Exceptionally Callous"**
16   **To Deny Parole For The Fourth Time Violating Due**
     **Process Of Law**

17
         Under the some evidence standard to support a denial of parole based on the commitment
18
     offense, the California Supreme Court in Rosenkrantz, supra, 29 Cal.4th at 683 wrote:
19
              "The Board's authority to make an exception [to the requirement of setting a
20            parole date] based on the gravity of a life term inmate's current or past offense
              should not operate so as to swallow the rule that parole is 'normally' to be
21            granted .... [A] life term offense or any other offenses underlying an
              indeterminate sentence must be *particularly egregious* to justify a denial
22            of a parole date." (See also, In re Barker, supra, 151 Cal.App. at 372 [same]).

23

---

24   1/ Pursuant to Federal rules of Evidence §201 (a)-(f), and Biggs, supra, 334 F.3d at 915 n.3, Petitioner
     requets the to take Judicial Notice of the "Decisions" of his first parole hearing held on May 1, 1997,
25   attached as Exhibit C (two year denial based on offense and conduct prior to imprisonment), his second
     parole decision held on May 10, 2001, attached as Exhibit D (two year denial based on offense and
26   conduct prior to imprisonment) and his third parole decision held on May 27, 2003, attached as Exhibit
     E (two year denial based on offense and conduct prior to imprisonment), to support his claims herein as
27   to the offense and conduct prior to imprisonment have now been included in the denial of parole four
28   times.

1    In determining if Petitioner's offense rises to some evidence that the offense was committed in

2 a "particularly egregious" manner, there must be "some evidence in the record before the Board [that]

3 supports the decision to deny parole *based upon the factors specified by statute and regulation*."

4 (Rosenkrantz, supra, 29 Cal.4th at 658). And most importantly in the instant case, the law states that

5 any court reviewing a finding of unsuitability "*must disregard circumstances of unsuitability that were*

6 *not relied upon by the [Board].*" (In re Elkins, 144 Cal.App.4th 475, 493 (2006), citing In re Scott, 133

7 Cal.App.4th 573, 595-596 (2005); In re Barker, 151 Cal.App.4th 346, 371 n.23 (2007) [same]).

8    Regarding the commitment offense, the Board denied Petitioner parole concluding the offense

9 rose beyond the particularly egregious standard of some evidence stating the offense was "carried

10 out in an especially cruel and callous manner," (Exhibit A at 42:16-17, 46:6-7; See Cal. Code Regs.,

11 tit. 15 §2402 (c)(1)), and to support said conclusion, the Board cited the offense as being (1) "carried

12 out in a dispassionate and calculated manner" and (2) "the offense was carried out in a manner which

13 demonstrates an exceptionally callous disregard for human suffering." (Exhibit A at 42:23-24, 43:4-6,

14 46:13-16, 25-26, 47:1; See Cal. Code Regs., tit. 15 §2402 (c)(1)(B) & (D)).

15    However, under the "some evidence" standard, the Superior Court of California, County of

16 Los Angeles, found "that there is *no evidence* to support the Board's findings that the commitment

17 offense was 'dispassionate and calculated,' such as an execution style murder, (see Cal. Code Regs.

18 tit. 15 §2402, subd. (c)(1)(B)) and that the 'offense was carried out in a manner that demonstrates

19 an exceptionally callous disregard for human suffering' (see Cal. Code Regs., tit. 15 §2402 subd.

20 (c)(1)(D)." (Exhibit B at 2:7-11). Furthermore, *Respondent does no dispute these findings* and as such

21 implicitly agrees with these findings by the Superior Court. (See Respondents Answer at 3:21-27, 4:

22 10-13, 6:13-14, 15:22-23). As Respondent correctly points out to this Court: [T]he superior court found

23 *no evidence supporting the Board's determination that the offense was carried out in an especially*

24 *callous manner.*" (Answer at 15:22-23).

25    Therefore, there was not some evidence "based upon the factors specified by statute and

26 regulations" showing Petitioner's offense was "particularly egregious" to justify a denial of parole based

27 on the commitment offense. (Rosenkrantz, supra, 29 Cal.4th at 658, 683; McQuillion, supra, 306 F.3d at

28 901-903; Biggs, supra, 334 F.3d at 915-916; Hill, supra, 472 U.S. at 457).

1    Respondent incorrectly assumes that because the Superior court "found that there is some

2 evidence that the commitment offense was one in which the victim was abused, defiled or mutilated

3 during or after the offense," that this was some evidence to deny parole based on the offense. (See

4 Answer at 4:8-13). On this issue, the Superior Court wrote:

> 5
> 6
> 7
> 8
> 9
> 10
> 11
> "Although there is no evidence to support the Board's specific findings regarding the commitment offense, the Court nevertheless finds that there is some evidence that the commitment offense was one in which the victim was abused, defiled or mutilated during or after the offense (see Cal. Code Regs. tit. 15 § 2402, subd. (c)(1)(C). 'We may uphold the [Board's] decision, despite a flaw in its findings, if the authority has made it clear it would have reached the same decision even absent the error.' (In re Dannenberg, (2005) 34 Cal.4th 1061, 1100). Based on the fact that the Board's discussion of the commitment offense cited to petitioner hitting, kicking and knocking the victim to the ground before stabbing him, the court concludes that the Board's mistake does not invalidate its decision to deny parole based on the commitment offense." (Exhibit B at 2:12-20).

12    *Nowhere* in the record did the Board, after its "discussion of the commitment offense," did it

13 state its denial was based on the fact that the "victim was abused, defiled or mutilated during or after

14 the offense" by Petitioner as a factor under the law to deny parole. (Exhibit A at 42-57). This factor,

15 Cal. Code Regs., tit. 15 §2402, subd. (c)(1)(C) (the victim was abused, defiled or mutilated), was

16 incorporated into the denial of parole *by the Superior Court, not the Parole Board.* (See Exhibit B at

17 2:12-20 ["the Court nevertheless finds...."]). The Superior Court explained its decision was based on

18 the "Board's discussion of the commitment offense cited to the petitioner hitting, kicking and knocking

19 the victim to the ground before stabbing him ...." (Exhibit B at 2:17-19). But the Board held that "the

20 beating as well as the physical and emotionally, mental issues" were cited as only supporting the finding

21 that the "offense was carried out in a manner which demonstrates an exceptionally callous disregard for

22 human suffering," (See Exhibit A at 43:1-22), *a factor that the Superior Court held was not supported*

23 *by some evidence.* (Exhibit B at 2:7-11; Answer at 4:10-12, 6:13-14, 15:22-23).

24    The Superior Court, in making such an individual assessment of the record concluding on its

25 own accord, and not the Board, that the "Court nevertheless finds that there is some evidence that the

26 commitment offense was one in which the victim was abused, defiled or mutilated during or after the

27 offense" as some evidence to deny parole based on the offense, *clearly violated the law* as for *a court is*

28 *not authorized to consider "circumstances of unsuitability that were not relied upon by the [Board]."*

13

1  (See, Elkins, supra, 144 Cal.App.4th at 493, citing Scott, supra, 133 Cal.App.4th at 595-596; Barker,

2  supra, 151 Cal.App.4th at 371 n.23).

3          Last but not least, the Superior Courts determination that the "victim was abused, defiled or

4  mutilated during or after the offense" due to Petitioner allegedly "hitting, kicking and knocking the

5  victim to the ground before stabbing him," (Exhibit B at 2:12-19), was *solely* based  on the Board's

6  reading into the record "the May 2005 counselor's report" which in turn said May 2005 counselor's

7  report was *solely* based on the Probation Officers Report's at "pages 2, 3 and 8." (See, Exhibit A at

8  12;13-27, 13:1-19; Exhibit F at 1 [May 2005 counselor's report stating summary of crime is *solely* based

9  on the "Probation Officers report pages 2, 3 and 8"]).

10          While the Probation Officers Report (POR) gives a general overall description of the offense at

11  page 2, the ***specific eyewitness account of exactly what occurred*** as to Petitioner's involvement is given

12  by the victim, Mr. Brooks, who stated:

13              "Victim Brooks told the probation officer that on the night of the attack, his
               girlfriend was arguing with the defendant. Mr. Brooks says that when he approached
14             the two, the defendant pulled a knife and the victim tried to escape. When he
               slipped in the mud, ***the defendant's friends kicked and hit Mr. Brooks*** and the
15             defendant stabbed him in the right eye." (See, Exhibit G at 3 (POR report)).

16
        Therefore, the only record before the Board and Superior Court as evidenced to Petitioner's
17
   culpability was that he purportedly "stabbed [Mr. Brook's] in the right eye," it was "the defendants
18
   ***friends***," ***not*** Petitioner, that "kicked and hit Mr. Brooks."
19
        In determining whether petitioner committed the offense in a "particularly egregious" manner,
20
   the law is clear that an adjudicator reviewing Petitioner's suitability for parole is only authorized to
21
   consider whether "[t]he ***prisoner*** committed the offense in an especially heinous, atrocious, or cruel
22
   manner," (Cal. Code Regs., tit. 15 §2402(c)(1)), viz., although Petitioner may be legally culpable for the
23
   acts of his alleged companions involved in the offenses, Petitioner's suitability for parole suitability for
24
   parole must be based on ***his*** actions. (In re Ramirez, 94 Cal.App.4th 549, 570 (2001) ["Ramirez took
25
   no active part in the assault of the clerk"]; In re Smith, 109 Cal.App.4th 489, 504 (2003) ["[T]here is
26
   no evidence ... Mr. Smith severely beat the victim," "the victim died of causes related to the acts of the
27
   prisoner, but the victim was not directly assaulted by the prisoner"]; In re Montgomery, 2007 DJDAR
28

1 | 16717, 16722 (Cal Ct of Appeals 2007) ["accomplice is treated the same as the perpetrator of a crime

2 | for the purposes of determining guilt and imposing sentence," but in "making a parole suitability

3 | determination," the determination must be made on "an individual consideration" of what the prisoner

4 | did]).

5 |      Therefore, the evidence that Petitioner's "friends kicked and hit Mr. Brooks," was not some

6 | evidence as to Petitioner's culpability under the law as an unsuitability factor. (Hill, supra, 472 U.S. at

7 | 457; Irons, supra, 479 F.3d at 662, 665).

**IV**

**THE BOARD VIOLATED DUE PROCESS OF LAW
WHEN IT FAILED TO SHOW PETITIONER "CURRENTLY"
POSES AN UNREASONABLE RISK OF DANGER IF
RELEASED; THERE WAS NO EVIDENCE UNDER THE
LAW TO SUPPORT A LACK OF VOCATIONAL/SELF-HELP
FINDING**

13 |      The Los Angeles County Superior Court concluded that "some evidence" exists "to support

14 | the Board's finding that petitioner is unsuitable based on insufficient self help and lack of vocational

15 | programming and based on a psychological evaluation that stated that the 'inmate still denies any

16 | responsibility for the crime and needed to develop insight before being considered for parole.'" (Exhibit

17 | B at 2:21-26).

18 |      The controlling California statute regarding parole in California is California Penal Code

19 | §3041, and as "general guidelines" to assist the Board in holding parole hearings, California Code of

20 | Regulations, title 15 §2402 et seq. was implemented. (Cal. Code Regs. tit. 15 §2402(c)). While Cal.

21 | Code Regs., tit. 15 §2402(b) states that "[a]ll relevant reliable information available to the panel shall

22 | be considered in determining parole suitability for parole," under the law to deny Petitioner's "liberty

23 | interest in release on parole," "expectation that he will be granted parole" and his "presumption that

24 | parole release will be granted parole," there must be "some evidence in the record before the Board

25 | [that] supports the decision to deny parole ***based upon the factors specified by statute and regulation.***"

26 | (Rosenkrantz, supra, 29 Cal.4th at 654, 658, 661; McQuillion, supra, 306 F.3d at 902-903; Biggs, supra,

27 | 334 F.3d at 914-915).

28 |      Furthermore, under the "some evidence" standard to deny Petitioner parole, that "some

evidence" must have an "indicia of reliability" to support the reasons to deny parole and can not and

15

1  must not be applied in a fashion that would "convert a court reviewing the denial of parole into a potted

2  plant." (McQuillion, supra, 306 F.3d at 904; Biggs, supra, 334 F.3d at 915; Scott, supra, 119 Cal.App.4th

3  at 898-899). As such, the California court's have explained that under the "some evidence" standard:

4
> The test in reviewing the Board's decision to deny parole *is not* whether
> some evidence indicates a parolee's release unreasonably endangers public
5
> safety. [Citations]. Some evidence of the existence of a particular factor
> *does not necessarily equate to some evidence the parolee's release*
6
> *unreasonably endangers public safety.*" (Barker, supra, 151 Cal.App.4th
7
> at 366; Lee, supra, 143 Cal.App.4th at 1408 [same]; Cooper, supra,
> 153 Cal.App.4th at 1059-1060 [same]).

8

9  **a) Ordering Self Help Specifically To Address The**
   **Issue Of Insight Into The Commitment Offense**
10  **Violates Petitioner's Due Process Rights As A**
    **Factor To Deny Parole**

11

12      The Superior Court's determination as some evidence to deny parole was based on the Board's

13  conclusions that "petitioner is unsuitable based on insufficient self help" and "based on a psychological

14  evaluation that stated that the inmate still denies responsibility for the crime and needed to develop

    insight before being considered for parole." (Exhibit B at 2:23-26). On this issue, the Board, in its
15
    decision of unsuitability, wrote:
16

17
> "And although you have taken advantage of some self help programs within the
> institution, sir, you have not sufficiently participated in beneficial *self help*
18
> *specifically to address the issue of insight.* The most recent psychological report,
> sir, that was taken into consideration is somewhat contradictory but at the same time
19
> it is not totally supportive of release. This particular report was prepared by
> contract psychologist Laura Petracek, dated December 8, 2005, in which she
20
> indicates that your risk if released to the community *is minimal*; however,
> she further states this inmate still denies any responsibility for his crime.
21
> He needs to develop some insight or reasonable explanation before being
> considered for parole." (Exhibit A at 45:5-22).
22

23
> "Again, we do note that it is the opinion of this Panel based on a review of the
> record that you have not sufficiently participated in beneficial *self help, specifically,*
24
> *to address the issue of insight.*" (Exhibit A at 48:19-23).

25
> "Sir the Panel makes the following findings, and that it is that you need to participate
> in more self help and, or therapy in order *to help you come to terms with the underlying*
26
> *cause of the commitment offense* in that even though *you are not required to*
> *discuss or admit to the commitment offense, you still need to be able to demonstrate*
27
> *some sort of insight when you come before this panel, and you have not done that*
> *today.*" (Exhibit A at 51:26, 52:1-10).

28

1    Therefore, the record solely states the "self help" needed "is specifically to address the issue of

2  *insight*," nothing more and nothing less. But there are four legal flaws that affirmatively show this is not

3  some evidence under the law to deny parole. First, as previously stated, under the law to deny petitioner

4  parole, there must be "some evidence in the record before the Board [that] supports the decision to deny

5  parole *based upon the factors specified by statute and regulation*." (Rosenkrantz, supra, 29 Cal.4th at

6  658). Petitioner submits that there are no "factors specified by statute and regulations" that authorize the

7  finding of unsuitability based on the Board's supposition that a parole applicant lacks "insight" into the

8  commitment offense. No where in California Penal Code §3041 or Cal. Code Regs. tit. 15 §2402(c) does

9  it state or even hint that lack of "insight" is authority, as "some evidence" that contains an "indicia of

10  reliability," to base a finding of unsuitability. (Hill, supra, 472 U.S. at 457; Biggs, supra, 334 F.3d at 915;

11  Scott, supra, 119 Cal.App.4th at 899; Rosenkrantz, supra, 29 Cal.4th at 658).

12    In fact, the law clearly states that during a parole suitability hearing, "the Board *shall not require*

13  *an admission of guilt to any crime* to which the prisoner was committed." Cal. Code regs. tit. 15 §2236

14  states:

15    "The facts of the crime shall be discussed with the prisoner to assist in
      determining the extent of personal culpability. *The Board shall not require*

16    *an admission of guilt to any crime for which the prisoner was committed.*
      A prisoner may refuse to discuss the facts of the crime ... and the refusal

17    *shall not be held against the prisoner*." (See also, In re Caswell, 92 Cal.App.4th
      1017, 1033 (2001); California Penal Code §5011(b)).

18

19    The Board told Petitioner that he was "not required to admit to the offense" and was "not

20  required to discuss the offense" in which petitioner exercised that right. (See, Exhibit A at 9:6-8; 11:11-

21  17). But regardless, the Board told petitioner that "even though you are not required to discuss or admit

22  to the commitment offense, you still need to be able to demonstrate some sort of insight when you come

23  before this Panel." (Exhibit A at 52:1-9) In other words, the Board *demands an admission of guilt* to the

24  commitment offense *that meets up to their specifications* before he may be found suitable for parole --

25  something Cal. Code of Regs. tit. 15 § 2236 specifically mandates the Board can not do by ordering that

26  "the Board shall not require an admission of guilt to any crime to which the prisoner was committed."

27  (See, In re Dannenberg, 125 Cal.Rptr.2d 458, 472-473 (2002) ["Board found unbelieveable"

28  Dannenbergs version of events. Court held that Penal code "[3041(b)] speaks in terms of the gravity of

1 | an inmates current or past offense's, not his credibility. Section 5011, subdivision (b) strongly indicates

2 | that the Legislature did not view the 'need to accept full responsibility for the crime as a relevant factor

3 | in setting a parole date"], disapproved on another point in In re Dannenberg, 34 Cal.4th 1061, 1082-

4 | 1083, 1100 (2005)).

5 |      Therefore, the Board's demand that petitioner must gain "self help," "specifically," "to be able

6 | to demonstrate some sort of insight" that meets up to the Board's specifications is not "some evidence"

7 | under the "factors specified by statute and regulations" that contain an "indicia of reliability" to deny

8 | parole for the fourth time. (Hill, supra, 472 U.S.. at 455-457; Rosenkrantz, supra, 29 Cal.4th at 658;

9 | California Penal Code 5011(b); Cal. Code Regs. tit. 15 §2236 and §2402 et seq.).

10 |      Second, the Board stated that the psychologist reasoned, after review of the entire record, that "if

11 | [Petitioner] would be released into the community, [his] risk would be **_minimal,_**" not an "unreasonable

12 | risk of danger to society if released from prison," the mandated criteria under the law to support an

13 | unsuitability finding. (Exhibit A at 38:3-5; Cal. Code Regs. tit. 15 §2402, subd. (a)).

14 |      Third, the only criteria remotely close to support a finding of unsuitability based on statute or

15 | regulations regarding psychological factors is Cal. Code Regs. tit. 15 **§2402 (c)(5), which states:**

16 |                          "Psychological Factors: The prisoner has a **_lengthy history of_**<br>                         **_severe mental problems related to the offense._**"

17 | Nowhere in the psychological evaluation does it state Petitioner has "severe mental problems related to

18 | the offense," to the contrary, the psychological evaluation states that "if released to the community, the

19 | risk is ... minimal." (Exhibit H at 4). Furthermore, nowhere in the "Comments and Recommendation/

20 | Treatment" section of the psychological evaluation does it conclude the need for mental health services.

21 | (Id.).

22 |      In In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643, (2005), the Board denied parole

23 | due to the fact Deluna had not "sufficiently participated in self help and therapy programming" in that

24 | Deluna needs "to understand the causative factors as well as his culpability in this particular crime." (Id.

25 | at 651). Deluna held this was not "some evidence" to deny parole writing:

26 |           "[D]efendant has been a model inmate, having no disciplinaries and achieving

27 |           a classification score of zero. Secondly, the Board issued a 'finding that the prisoner<br>          still needs therapy.' Doctor Rueschenberg, however, stated in the most recent

28 |           Psychological Assessment that there was no need for mental health services.<br>          It appears that the Board would put [defendant] in an impossible situation by

1

2

3

4

demanding proof of therapy which will never be given since there is no
diagnosed need. [Defendant] has consistently been rated in his doctor and
counselor reports as posing only a moderate, average, or even low risk to the
public if released. The Board's decision to ignore the experts and announce a
contrary finding, without any evidentiary support, was arbitrary and capricious."
(Id. 24 Cal.Rptr.3d at 651-652).

5

6

7

8

9

10

"The Board's finding that defendant needs therapy is contradicted by the
record, as it was in In re Ramirez, (2001) 94 Cal.App.4th 549, 571, and
In re Scott (2004) 119 Cal.App.4th 871, 896-897. A psychological
evaluation for October 1998, stated, 'He does not have a psychiatric
condition which would benefit from mental health treatment.' As the
Board quoted during the parole hearing in March 2002, the Rueschenberg
evaluation of August 2001 stated '*There do not seem to be any signs or
symptoms of a mental disorder, and [defendant] does not appear to be in
need of mental health services.*" (Id. at 24 Cal.Rptr.3d at 652).

11    As in Deluna, the psychologist *did not recommend* "mental health ... treatment either during

12 [Petitioner's] incarceration period or following parole," (Exhibit H at 4), and Willis v Kane, supra, 485

13 F.Supp.2d at 1132-1133, held that because the "psychological evaluation found no mental illness, no

14 evidence of mood or thought disorder, and identified no need for further treatment or programming,"

15 that the "favorable psychological reports and the absence of any mention therein of a need for further

16 self help or therapy programming, there was not some evidence to support the BPH's determination

17 that Willis had not sufficiently participated in beneficial self help and therapy programming." (See also,

18 Irons, supra, 358 F.Supp.2d at 948 [Board denying parole based "on the need for more therapy such that

19 petitioner can face, discuss, understand and cope with stress in a nondestructive manner is devoid of

20 any medical or other evidence."]; Irons, supra, 479 F.3d at 663 [same]). As verified in the **"Current**

21 **Mental Status Treatment Needs"** section of the psychological evaluation, *no self help/therapy is*

22 *prescribed nor indicated.* (See Exhibit H at 3).

23    In furtherance, as to the Board's "findings" (Exhibit A at 52:1-2), the California Court of Appeals

24 in Barker, supra, dealt with an identical situation as such:

25

26

27

28

"[T]he Board actually made two of what is referred to as 'findings': 'that
the inmate needs therapy in order to face, discuss, understand and cope with
stress in a nondestructive manner, and until progess is made, the inmate
continues to be unpredictable and a threat to others. And the inmate's gains
are recent. He must demonstrate an ability to maintain these gains over an
extended period of time'.

1

¶ Regarding the Board's first finding, that Barker needed therapy, none of the recent psychological reports in the record mentions any need for therapy - or, for that matter, any difficulty in dealing with stress in a nondestructive manner.

2

3

¶ The Board's second finding, that Barker's gains are recent, is likewise unsupported by 'some evidence.' As the Board itself acknowledged, Barker has been 'disciplinary free since 1995.'" (Id. 151 Cal.App.4th at 366-368).

4

5

6

While Barker had six (6) disciplinaries since in his incarceration, (Barker, supra, at 355),

7

Petitioner has "not incur[red] any disciplinaries while in the institution." (Exhibit A at 56:17-23). And

8

as in Petitioner's case, "none of the recent psychological reports in the record mentions any need for

9

therapy - or, for that matter, any difficulty in dealing with stress in a nondestructive manner." (See,

10

Exhibit H at 3); Barker, supra, 151 Cal.App.4th at 366). [2/]

11

Fourth, under the "some evidence" standard, continued reliance on the circumstances

12

surrounding the commitment offense and conduct prior to imprisonment to deny parole, as done in

13

Petitioner's case for the fourth time, violates due process of law. (See Claim III, supra; Irons, supra, 479

14

F.3d at 664-665; Hill, supra, 472 U.S. at 457).

15

Therefore, the reliance on self help/therapy to deny parole  was not supported by "some

16

evidence" that contained an "indicia of reliability." (Hill, supra, 472 U.S. at 457; Irons, supra, 479 F.3d

17

at 662; Biggs, supra, 334 F.3d at 915; McQuillion, supra, 306 F.3d at 904).

18

**b) There Was No Evidence Showing Petitioner**
**Not Obtaining A Vocation Show's Petitioner**

19

**"Currently" Poses An Unreasonable Risk Of**
**Danger If Paroled**

20

21

While Cal. Code Regs. tit. 15 §2402 (c)(1)-(6) are listed factors "tending to show unsuitability,"

22

sections 2402 (d)(1)-(9) are factors "tending to show suitability."  Under the law, neither California

23

Penal Code 3041 nor Cal. Code Regs. tit. 15  §2402 (c)(1)(6), list  not taking a vocation while in prison

24

as a factor tending to show unsuitability. In considering the Board's use of a lack of obtaining a prison

25

vocation as an unsuitability finding, the Board  "was implicitly construing section 2402, subdivision

26

(d)(8) of title 15 of the California Code of Regulations, which indicates that the Board may consider

27

28

2/ In In re Roderick, _____ Cal.App.4th _____, 2007 DJDAR 12575, 12580 & n.14, (Cal. Ct. Appeals 2007), the Court found that the Board's statement that "the prisoner needs to participate in self help" was a "*stock phrase* used to deny parole to Roderick four times. Apparently it is also used generally across the state." [Citations too numerous to mention]).

1  whether '[t]he prisoner has made realistic plans for release or has developed marketable skills that

2  can be put to use upon release.' (Cal. Code Regs. tit. 15 §2402, subd. (d)(8))." (In re Andrade, 141

3  Cal.App.4th 807, 46 Cal.Rptr.3d 317, 324 (2006)). "A positive answer to that question is to be regarded

4  as a factor suggesting the inmate *is suitable for parole*." (Id. at 324).

5      In Petitioner's case, "the regulation requires an inmate to have '*realistic* plans for release' *or* to

6  have 'developed marketable skills that can be put to use upon release." (Andrade, supra, 46 Cal.Rptr.3d

7  at 325). Here, the Board, after review of the entire record, concluded that Petitioner has "parole plans to

8  live with [his] brother and, or [his] cousin upon release" and the record showed Petitioner has a job offer

9  as "an English teacher for [a] school as well as other management duties." (Exhibit A 25:1-7, 49:15-19).

10  Thus, Petitioner's adequate parole plans is all that is requested of him under said regulations, as Andrade

11  held:

> 12  "Thus, based on its clear language, the regulation's requirement that an inmate have parole plans is limited to requiring realistic parole plans.
>
> 13  ¶ More importantly, the regulation does not suggest that such fool-proof plans are necessary. The plain language of the regulation supports the
> 14  conclusion. By referring to 'realistic' parole plans, the regulation does not contemplate iron-clad and unrealistic plans." (Andrade, supra,
> 15  46 Cal.Rptr.3d at 325).

16      In fact, Petitioner's adequate "parole plans should have been seen as a factor supporting his

17  suitability for parole." (Andrade, supra, 46 Cal.Rptr.3d at 326); See also, Martin v Marshall, 431

18  F.Supp.2d 1038, 1046 (N.D. Cal. 2006) [a parole applicant need only have "realistic parole plans"]).

19      Even "assuming there may be some connection between [Petitioner's lack of] ... vocational

20  training, the Board did not established how this ... makes him unsuitable as a threat to public safety."

21  (Deluna, supra, 126 Cal.App.4th at 598, 24 Cal.Rptr.3d at 652). The legal criteria to deny Petitioner

22  parole mandates the Board to present "some evidence" that conatins an "indicia of reliability" showing

23  petitioner "*CURRENTLY*" presents an unreasonable risk of danger. (McQuillion, supra, 306 F.3d at

24  904; Biggs, supra, 334 F.3d at 915; Smith, supra, 114 cal.App.4th at 370, 372 [evidence must show "that

25  a prisoner *currently* would pose an unreasoanable risk of danger if released at this time"]; Lee, supra,

26  143 Cal.App.4th at 1414 [same]; Elkins, supra, 144 Cal.App.4th at 499 [same]; Weider, supra, 145

27  Cal.App.4th at 589 [same]; Lawrence, supra, 59 Cal.Rptr.3d at 574 [same]; Dannenberg, supra, 2007

28  DJDAR at 17136 [same]).

1    A denial of parole "may not be upheld merely because the Board has mouthed words that have

2  been held to constitute [unsuitability] .... There must be an adequate factual underpinning for the

3  Board's determination." (In re Caswell, 92 Cal.App.4th 1017, 1027 (2001); McQuillion, supra, 306

4  F.3d at 905 [same]). The United States Supreme Court has also held that when an administrative agency

5  makes a determination in a legal proceeding, "the agency *must* articulate a rational connection between

6  the facts found and the choices made." (Bowman Trans v Arkansas-Best Frieght, 419 U.S. 281, 285, 42

7  L.Ed.2d 447, 456, 95 S.Ct. 438 (1974)).

8    In Petitioner's case, not only did the Board fail to show an adequate factual underpinning for the

9  Board's determination of unsuitability in regards to the vocational issue, but to the contrary, the record

10  shows Petitioner had adequate parole plans. As such, denial of parole for lack of an in-prison vocation

11  was not "some evidence" to deny parole, was "arbitrary" and violated due process of law. (Hill, supra,

12  472 U.S. at 457; Irons, supra, 479 F.3d 662). [3/]

13                                    **CONCLUSION**

14

15    For the reasons stated herein, the habeas petition must be granted and Petitioner be given a parole

16  release date and release on that date. (McQuillion v Duncan, 342 F.3d at 1015-1016 (9th Cir 2003);

17  Smith, supra, 109 Cal.App.4th at 507).

18

19  Dated:                                     Submitted by:

20  *12-19-07*

21                                             _Justo Escalante_

22                                             Justo Escalante, In Pro Se

23

24

25  3/ In McQuillion, supra, 306 F.3d 895, a double execution style murder case, regardless of McQuillion

26  never obtaining a prison vocation, the Board gave McQuillion a parole date, then revoked said date for
    lack of "completed vocational training and did not have a prior vocational skill." (Id. at 911). However,

27  the Court held that lack of a vocation was not "some evidence" to deny/revole parole due in part to the
    fact McQuillion had "job opportunities." (Id.).

28

# EXHIBIT   A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life    )
Term Parole Consideration    )
Hearing of:                  )    CDC Number E-91258
                             )
JUSTO ESCALANTE              )
                             )
_____)



CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 15, 2005

4:08 P.M.


PANEL PRESENT:

Ms. Margarita Perez, Presiding Commissioner
Mr. Rufus Morris, Deputy Commissioner



OTHERS PRESENT:

Mr. Justo Escalante, Inmate
Ms. Marcia Hurst, Attorney for Inmate
Mr. Jack Delavigne, Deputy District Attorney
Correctional Officers Unidentified



CORRECTIONS TO THE DECISION HAVE BEEN MADE
            _____    No    See Review of Hearing
            _____    Yes   Transcript Memorandum



**Kristin Ledbetter, Peters Shorthand Reporting**

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 17 |
| Post-Commitment Factors | 27 |
| Parole Plans | 19 |
| Closing Statements | 39 |
| Recess | 41 |
| Decision | 42 |
| Adjournment | 57 |
| Transcriber Certification | 58 |

--oOo--

1

| 1 | **P R O C E E D I N G S** |
|---|---|
| 2 | **DEPUTY COMMISSIONER MORRIS:** We're on |
| 3 | record. |
| 4 | **PRESIDING COMMISSIONER PEREZ:** Thank you. |
| 5 | Good afternoon, sir. This is a Subsequent |
| 6 | Parole Consideration Hearing for Justo |
| 7 | Escalante, E-S-C-A-L-A-N-T-E, CDC number |
| 8 | E-91258. Today's date is December 15th, 2005. |
| 9 | We are located at the Correctional Training |
| 10 | Facility at Soledad. The time is 4:08 p.m. |
| 11 | According to the record, sir, you were received |
| 12 | by the department on April 18th, 1991. Your |
| 13 | life term began on May 29th, 1991, out of the |
| 14 | County of Los Angeles for the offense of |
| 15 | aggravated mayhem with use of a deadly weapon, |
| 16 | Penal Code Section 205, Penal Code Section |
| 17 | 12022(b), Case Number PA004647, Count Two, for |
| 18 | which you were assessed a term of seven years to |
| 19 | life plus one year with a minimum eligible |
| 20 | parole date of May 29th, 1998. Sir, the record |
| 21 | also reflects you were convicted of two other |
| 22 | offenses, non-controlling offenses. Both were |
| 23 | transporting sales of controlled substance, |
| 24 | HNS11352(a), both out of Los Angeles, Count One, |
| 25 | Case Number LA005012 and the other Count One, |
| 26 | Case Number A820178. Sir, this hearing is being |
| 27 | tape recorded, and for the purposes of voice |

2

1   identification we're going to go around the room
2   and ask everyone to identify themselves, stating
3   their first name, last name, spelling their last
4   name.  When we get to you, sir, I'd like to ask
5   you to provide us with your CDC number as well.
6   Okay.  I will start with myself and go to my
7   left.  My name is Margarita Perez, P-E-R-E-Z,
8   Commissioner with the Board of Parole Hearings.
9        **DEPUTY COMMISSIONER MORRIS:**  Rufus
10  Morris, M-O double R-I-S, Deputy Commissioner.
11       **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  Jack
12  Delavigne, D-E-L-A-V-I-G-N-E, Deputy District
13  Attorney, LA County.
14       **ATTORNEY HURST:**  Marcia Hurst, H-U-R-S-T,
15  counsel for Mr. Escalante.
16       **INMATE ESCALANTE:**  Justo Escalante,
17  E-S-C-A-L-A-N-T-E, E-91258.
18       **PRESIDING COMMISSIONER PEREZ:**  Okay.
19  Very good, sir.  I note for the record that we
20  have two correctional officers in the room.
21  They will not be participating in today's
22  hearing.  They are here for the purposes of
23  security.  Sir, before we begin, there's a light
24  blue document sitting in front of you.  Would
25  you read that out loud for me, please.
26       **INMATE ESCALANTE:**  Which one?
27       **PRESIDING COMMISSIONER PEREZ:**  The blue

3

1  one.

2        **INMATE ESCALANTE:**  The blue one.

3        "The Americans with Disabilities

4        Act, ADA, is a law to help people

5        with disabilities.  Disabilities

6        are problems that make it harder

7        for some people to see, hear,

8        breathe, talk walk, learn, think,

9        work, or take care of themselves

10      than it is for others.  Nobody can

11      be kept out of public places and

12      activities because of a

13      disability.  If you have a

14      disability, you have the right to

15      ask for help to get ready for your

16      Board of Parole Hearings, BPH, get

17      to the hearing, talk, read form

18      and papers, and understand the

19      hearing process.  BPH will look at

20      what you ask for to make sure that

21      you have a disability that is

22      covered by the ADA and that you

23      have asked for the right kind of

24      help.  If you do not get help or

25      if you don't think you got the

26      kind of help you need, ask for a

27      BPH 1074 Grievance Form.  You can

4

1       also get help to fill it out."

2          **PRESIDING COMMISSIONER PEREZ:**  Do you

3   understand what that means, sir?

4          **INMATE ESCALANTE:**  Yes.

5          **PRESIDING COMMISSIONER PEREZ:**  Can you

6   tell me what that means in your own words,

7   please.

8          **INMATE ESCALANTE:**  If you have any

9   problems with myself or disabilities or mental

10  problems.

11         **PRESIDING COMMISSIONER PEREZ:**  That you

12  can ask for help.

13         **INMATE ESCALANTE:**  Yes.

14         **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

15  that if you do not receive the assistance you

16  think you need, then you can file a grievance

17  form.

18         **INMATE ESCALANTE:**  Yes.

19         **PRESIDING COMMISSIONER PEREZ:**  Okay.  And

20  I do note for the record that on February 1st,

21  2005, you signed a BPT Form 1073 which is the

22  Request for Reasonable Accommodations Form in

23  which you indicated that you have no

24  disabilities; is that correct, sir?

25         **INMATE ESCALANTE:**  Yes.

26         **PRESIDING COMMISSIONER PEREZ:**  Okay.

27  Very good.  Do you wear glasses, sir?

5

1          INMATE ESCALANTE:  Yeah, I wear glasses.

2          PRESIDING COMMISSIONER PEREZ:  Will you

3   require them for today's hearing?

4          INMATE ESCALANTE:  No.

5          PRESIDING COMMISSIONER PEREZ:  Are you

6   hearing impaired?

7          INMATE ESCALANTE:  No.

8          PRESIDING COMMISSIONER PEREZ:  Have you

9   ever or are you currently on psychotropic

10  medications?

11         INMATE ESCALANTE:  No.

12         PRESIDING COMMISSIONER PEREZ:  Are you

13  currently on any medication whatsoever?

14         INMATE ESCALANTE:  No.

15         PRESIDING COMMISSIONER PEREZ:  Okay.  You

16  received your GED in 2000; is that right?

17         INMATE ESCALANTE:  Yes.

18         PRESIDING COMMISSIONER PEREZ:  Okay.

19  Very good.  Counsel, have all ADA issues been

20  addressed to the best of your knowledge?

21         ATTORNEY HURST:  Yes, they have.

22         PRESIDING COMMISSIONER PEREZ:  Thank you.

23  Sir, this hearing is being conducted pursuant to

24  Penal Code Sections 3041 and 3042 and the rules

25  and regulations of the Board of Parole Hearings

26  governing Parole Consideration Hearings for life

27  inmates.  If at any time during today's hearing

6

1  we're talking too fast or if you don't

2  understand something that we're trying to

3  convey, I want you to let us know right away so

4  that we can immediately stop, back up, and make

5  sure, we will make sure that you understand

6  before we proceed.  Okay.

7      **INMATE ESCALANTE:**  Okay.

8      **PRESIDING COMMISSIONER PEREZ:**  Sir, the

9  purpose of today's hearing is to once again to

10  consider your suitability for parole.  In doing

11  so, we will consider the number and nature of

12  the crime you were committed for, your prior

13  criminal and social history, as well as your

14  behavior and programming since your arrival

15  within the California Department of Corrections

16  and Rehabilitation.  Commissioner Morris and

17  myself have had the opportunity to review your

18  record sir, and during today's hearing, you will

19  have the opportunity to correct or clarify that

20  record.  We will reach a decision today and

21  inform you of that decision.  If we do find you

22  suitable for parole, we will explain the length

23  of your confinement to you.  Okay.

24      **INMATE ESCALANTE:**  Okay.

25      **PRESIDING COMMISSIONER PEREZ:**  Sir,

26  before we recess for deliberations, the District

27  Attorney, your attorney, and you will have the

7

1    opportunity to make a closing statement.  Your

2    statement should be limited to why you feel that

3    you are suitable for parole.  We will then

4    recess, clear the room, and deliberate.  Once

5    we've concluded our deliberations, we will

6    resume the hearing and announce our decision.

7    The California Code of Regulations states that

8    regardless of time served a life inmate shall be

9    found unsuitable for and denied parole if in the

10   opinion of the Panel the inmate would pose an

11   unreasonable risk of danger to society.  Do you

12   understand that, sir?

13        **INMATE ESCALANTE:**  Okay.

14        **PRESIDING COMMISSIONER PEREZ:**  Okay.

15   Very good.  Sir, during today's hearing, you

16   have certain rights.  You have the right to a

17   timely notice of this hearing; you have the

18   right to present relevant documents, and you

19   have the right to review your Central File.  And

20   I do note for the record that on February 1st,

21   2005, you were provided the opportunity to

22   review your Central File; is that correct, sir?

23        **INMATE ESCALANTE:**  Yes.

24        **PRESIDING COMMISSIONER PEREZ:**  Did you in

25   fact review it?

26        **INMATE ESCALANTE:**  Yes.

27        **PRESIDING COMMISSIONER PEREZ:**  Okay.

8

1  Very good.  Counsel, have all your client's

2  rights been met to the best of your knowledge?

3        **ATTORNEY HURST:**  Yes, they have.

4        **PRESIDING COMMISSIONER PEREZ:**  Sir, you

5  have an additional right, and that is the right

6  to be heard by an impartial Panel.  Do you have

7  any objections to today's Panel, sir?

8        **INMATE ESCALANTE:**  No.

9        **PRESIDING COMMISSIONER PEREZ:**  Counsel,

10  do you have any objections to today's Panel?

11        **ATTORNEY HURST:**  No, I don't.

12        **PRESIDING COMMISSIONER PEREZ:**  Thank you.

13  Sir, you will receive a copy of our written

14  tentative decision today.  That decision becomes

15  effective within 120 days.  In the future you

16  will receive a copy of the decision as well as a

17  copy of today's transcript.  Okay.

18        **INMATE ESCALANTE:**  Okay.

19        **PRESIDING COMMISSIONER PEREZ:**  Sir, the

20  Board has eliminated its appeals process.  So

21  what that means in terms of today's hearing,

22  it's kind of like the 602 process within the

23  institution.  We've eliminated our appeals

24  process.  So what that means is if you disagree

25  with anything that occurs during today's

26  hearing, you can go directly to the Court with

27  your complaint.  Do you understand?

9

1          **INMATE ESCALANTE:**  Okay.

2          **PRESIDING COMMISSIONER PEREZ:**  Do you

3    understand that?

4          **INMATE ESCALANTE:**  Yes.

5          **PRESIDING COMMISSIONER PEREZ:**  Okay.

6    Very good.  Sir, during today's hearing you are

7    not required to admit to the offense.  You are

8    not required to discuss the offense.  However,

9    it's important for you to understand that this

10   Panel does accept true the findings of the

11   Court.  We are not here to retry your case.  We

12   are here to determine whether or not you are

13   suitable for parole.  Okay.

14         **INMATE ESCALANTE:**  Okay.

15         **PRESIDING COMMISSIONER PEREZ:**  Mr.

16   Morris, is there confidential information, and

17   will we be using it during today's hearing?

18         **DEPUTY COMMISSIONER MORRIS:**  There is

19   confidential information; however, we will not

20   be using any.  No.

21         **PRESIDING COMMISSIONER PEREZ:**  Okay.

22   Sir, I have passed a checklist marked Exhibit

23   One to your counsel to ensure that we are all

24   operating off of the same documents, and at this

25   time I will ask her to verify the accuracy of

26   that checklist.

27         **ATTORNEY HURST:**  I do have all the

10

1  documents.  Thank you.

2        **PRESIDING COMMISSIONER PEREZ:**  I will ask

3  the same question of the DA.

4        **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  I

5  have them.  Thank you.

6        **PRESIDING COMMISSIONER PEREZ:**  Thank you.

7  Counsel, any additional documents to submit to

8  this Panel today?

9        **ATTORNEY HURST:**  Yes.  There is an

10 additional support letter dated December 4th,

11 2005.  I think I can give one but

12 (indiscernible).

13       **PRESIDING COMMISSIONER PEREZ:**  Okay.  Do

14 you have any preliminary objections, counsel?

15       **ATTORNEY HURST:**  No.

16       **PRESIDING COMMISSIONER PEREZ:**  Will your

17 client be speaking with us?

18       **ATTORNEY HURST:**  He will only be speaking

19 as to post conviction.

20       **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

21 does that mean he will not be speaking about his

22 criminal history?

23       **ATTORNEY HURST:**  That's correct.

24       **PRESIDING COMMISSIONER PEREZ:**  Okay.

25 Will he be discussing personal factors?

26       **ATTORNEY HURST:**  No, just post

27 conviction.

11

1          **PRESIDING COMMISSIONER PEREZ:**    Okay.

2    What about --

3          **ATTORNEY HURST:**    Well, current personal

4    factors and parole plans, no prior social

5    history, no.

6          **PRESIDING COMMISSIONER PEREZ:**    Okay.    So

7    then we would not be discussing personal factors

8    because that's typically what's covered is

9    everything, his life prior to CDC.

10          **ATTORNEY HURST:**    Right.

11          **PRESIDING COMMISSIONER PEREZ:**    Okay.    So

12    the only thing he'll be discussing with me is

13    his parole plans and post conviction.

14          **ATTORNEY HURST:**    And post conviction.

15          **PRESIDING COMMISSIONER PEREZ:**    Post

16    conviction.

17          **ATTORNEY HURST:**    Yes.    That's correct.

18          **PRESIDING COMMISSIONER PEREZ:**    Okay.

19    Very good.

20          **ATTORNEY HURST:**    And if he wants to

21    change his mind during the course of the

22    hearing, that's fine too.

23          **PRESIDING COMMISSIONER PEREZ:**    It's

24    certainly your option, sir.    Okay.    Sir, before

25    we begin I do need to swear you in nevertheless,

26    if I can get you to raise your right hand.    Do

27    you solemnly swear or affirm that the testimony

12

1  you provide will be the truth, the whole truth,

2  and nothing but the truth?

3          **INMATE ESCALANTE:**  Yes.

4          **PRESIDING COMMISSIONER PEREZ:**  Okay.

5  Very good.  Sir, what I will do is I will read

6  into the record the commitment offense and your

7  version according to the counselor's report, and

8  then after that we'll move on to the next

9  section in that you have opted not to discuss

10  the commitment offense.  Do you understand

11  everything I've said so far?

12          **INMATE ESCALANTE:**  Yes.

13          **PRESIDING COMMISSIONER PEREZ:**  Okay.

14  Very good.  I will read into the record the

15  summary of the crime as well as the prisoner's

16  version as outlined in the May 2005 counselor's

17  report prepared by Correctional Counselor One S.

18  Martinez, M-A-R-T-I-N-E-Z.  And the record

19  states,

20          "On September 10th, 1990, at

21          approximately 4:20 a.m. victim

22          James Brooks got into an argument

23          with the prisoner, Justo

24          Escalante.  Escalante wanted to

25          borrow the victim's car but the

26          victim refused.  Escalante and

27          some of his friends started

13

| | |
|---|---|
| 1 | hitting and kicking the victim. |
| 2 | While the victim was down, |
| 3 | Escalante struck the victim in the |
| 4 | eye with a knife penetrating the |
| 5 | brain.  Escalante was arrested on |
| 6 | September 26th, 1990, while in |
| 7 | custody on another matter.  The |
| 8 | victim James Brooks told the |
| 9 | probation officer that on the |
| 10 | night of the attack his girlfriend |
| 11 | was arguing with Escalante. |
| 12 | Brooks stated that when he |
| 13 | approached the two Escalante |
| 14 | pulled a knife.  Brooks retreated; |
| 15 | however, he slipped in the mud. |
| 16 | Escalante's friends kicked and hit |
| 17 | the victim Brooks, and Escalante |
| 18 | stabbed the victim in the right |
| 19 | eye.  The victim says he blacked |
| 20 | out and did not remember anything |
| 21 | until approximately six days |
| 22 | later.  The victim further stated |
| 23 | that he used to be a friend of |
| 24 | Escalante's and did not understand |
| 25 | the unprovoked attack.  The victim |
| 26 | suffered permanent loss of sight |
| 27 | in his right eye and a frontal |

14

1       lobotomy was performed resulting

2       in permanent brain damage.  The

3       victim's medical bills were in

4       excess of 177,000 dollars.  The

5       victim stated that he wanted

6       Escalante to pay for what he did.

7       There are no other crime partners

8       named in the POR."

9  In terms of the inmate's version, the record

10  reflects,

11      "Inmate Escalante stated that he

12      is innocent of this crime, noting

13      that he did not plead guilty but

14      rather that he was convicted by a

15      jury trial.  Escalante claims that

16      he did not commit the crime, nor

17      was he in the area when this crime

18      occurred.  Escalante stated that

19      he knew the area where the crime

20      had occurred and had been in the

21      area before.  But according to

22      Escalante, on that particular

23      night he was in an apartment

24      building with a friend far away

25      from the crime scene.  Escalante

26      points out that it would have been

27      difficult for him to have

15

1           committed the crime because the

2           victim was a large adult male, and

3           Escalante was much smaller than

4           the victim.  Escalante stated the

5           first time he ever saw the victim

6           was in the courtroom.  He stated

7           that he did not know the victim,

8           denying the victim's statement

9           that they were once friends.

10          Escalante states that he did not

11          speak English at the time of his

12          arrest and argues, how could he

13          have been friends with the

14          English-speaking victim.

15          Escalante pointed out the fact

16          that if he was guilty of this

17          crime, he would have fled the

18          jurisdiction and not remained in

19          the same area.  Escalante also

20          stated that he never had a knife."

21   Comments, counsel.

22        **ATTORNEY HURST:**  Actually, I do have one

23   comment, and you know, it was a terrible crime,

24   but I would note that on page ten of the

25   appellate report that there is an indication

26   that there was insufficient evidence to

27   establish permanent brain damage, although there

16

1  was obviously an alternate theory to support the

2  conviction.  But nevertheless, I think that's of

3  some importance.

4      **PRESIDING COMMISSIONER PEREZ:**  Thank you.

5  In terms of the inmate's criminal record, the

6  record reflects that you have a US INS Hold to

7  Honduras.  There is no juvenile arrest record

8  noted in the file.  The record does reflect that

9  you were arrested by the Los Angeles Police

10  Department for transporting and sales of

11  controlled substance.  In 1988 you were

12  convicted of a felony and sentenced to 36 months

13  probation, 180 days in jail, a fine, and a

14  suspended prison sentence.  In April of 1989,

15  sir, you were arrested by the Los Angeles Police

16  Department for murder.  You were subsequently

17  released due to lack of corpus.  Again, in 1989

18  you were arrested by the Los Angeles Police

19  Department for being a felon addict in

20  possession of a firearm.  You were convicted of

21  a misdemeanor and sentenced to probation and

22  jail.  In 1990 you were arrested by the Los

23  Angeles Police Department for grand theft auto.

24  You were released due to lack of sufficient

25  evidence.  Again, in 1990, you were arrested for

26  possession of narcotics, controlled substance.

27  A warrant was issued for possession of bad

17

1    checks, money order.  No disposition is noted.

2    Again, in 1990, you were arrested by the Los

3    Angeles Police Department for transportation,

4    sales of narcotics and controlled substance, and

5    in September of 1990 a warrant was issued.

6    Again, in 1990, you were arrested by the Los

7    Angeles Police Department for attempted murder

8    which is part of the commitment offense.

9    Comments, counsel.

10          **ATTORNEY HURST**:  Yes.  I do have a couple

11   of comments there.  There are several of these

12   that were arrests that did not result in

13   convictions, but, however, there were two that

14   were deemed not arrests but detained only, and

15   that would be 4/14/89, arrest for murder.  That

16   was not an arrest, and I think 3/13/90, the

17   grand theft vehicle, that was a detained only as

18   well according to the rap sheet.

19          **PRESIDING COMMISSIONER PEREZ**:  Okay.

20   Thank you.  Do you have anything else?

21          **ATTORNEY HURST**:  No.  That's it.

22          **PRESIDING COMMISSIONER PEREZ**:  In terms

23   of the inmate's personal factors, the record

24   reflects that he was about 21 at the time of the

25   offense, and he's currently approximately 36

26   years of age.  Escalante is one of five children

27   born to Debra and Jose Escalante in Honduras.

18

1    Escalante's father and two brothers still reside
2    in Honduras.  They came to the United States
3    from Honduras in 1984.  He has two sisters who
4    currently live in Southern California.  His
5    mother passed away in 1988.  The record reflects
6    he has no children, and he's never been married.
7    Furthermore, the record reflects that you
8    attended school in Honduras until the age of 13,
9    never serving in the Armed Forces.  The record
10   reflects Escalante claims that he began drinking
11   alcohol at the age of 16.  At the time of his
12   arrest he was consuming approximately two six
13   packs weekly.  He claims he began smoking
14   marijuana at the age of 19, and at the time of
15   his arrest, he was smoking marijuana
16   approximately two joints weekly.  He claims he
17   began snorting cocaine at the age of 26, and at
18   the time of his arrest, he was spending
19   approximately 100 dollars weekly to support his
20   habit.  The POR further states, indicates, that
21   Escalante supported himself through day work
22   either in construction or pool cleaning.  He
23   made about 50 to 60 dollars an hour when work
24   was available.  There was no gang affiliation
25   noted.  There is no history of sexual deviation
26   or mental disorder.  Escalante is currently 37
27   years old.  There are no medical problems noted

19

1  at this time.  Any comments, counsel?

2       **ATTORNEY HURST:**  No, no comments.

3       **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  It

4  was 50 or 60 dollars a day.

5       **PRESIDING COMMISSIONER PEREZ:**  Did I say

6  something else?

7       **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  You

8  said an hour.

9       **PRESIDING COMMISSIONER PEREZ:**  Okay.  A

10  day.  That would be pretty good if it was 50 to

11  60 dollars an hours.  Okay.  Now, sir, we get to

12  the portion where are willing to, the portion

13  where you are willing to speak with us, your

14  future plans.  The record reflects you have a US

15  INS Hold; is that correct?

16       **INMATE ESCALANTE:**  Yes.

17       **PRESIDING COMMISSIONER PEREZ:**  Okay.  It

18  is your plan upon your release to parole given

19  the fact that more likely than not you would be

20  deported to Honduras.

21       **INMATE ESCALANTE:**  Yes.

22       **PRESIDING COMMISSIONER PEREZ:**  That you

23  would either live with your brother or your

24  cousin in Honduras.

25       **INMATE ESCALANTE:**  Yes.

26       **PRESIDING COMMISSIONER PEREZ:**  Okay.

27  Were you in this country illegally?

20

1         INMATE ESCALANTE:  Illegally, yeah.

2         PRESIDING COMMISSIONER PEREZ:  Okay.  So

3   you didn't, did you have a green card or

4   anything?

5         INMATE ESCALANTE:  No.

6         PRESIDING COMMISSIONER PEREZ:  No

7   permission?

8         INMATE ESCALANTE:  No.

9         PRESIDING COMMISSIONER PEREZ:  So there

10  is probably very small chance that you would

11  remain in the US, right?

12        INMATE ESCALANTE:  Yes.

13        PRESIDING COMMISSIONER PEREZ:  Okay.  In

14  terms of your employment plans, the record

15  reflects that it is your plan to work with an

16  electrician or a plumber and that you have

17  experience in both of those fields.

18        INMATE ESCALANTE:  Yes.

19        PRESIDING COMMISSIONER PEREZ:  Where did

20  you gain that experience, sir?

21        INMATE ESCALANTE:  My dad.

22        PRESIDING COMMISSIONER PEREZ:  Pardon me?

23        INMATE ESCALANTE:  My father.

24        PRESIDING COMMISSIONER PEREZ:  From your

25  father, both of them?

26        INMATE ESCALANTE:  Yes.

27        PRESIDING COMMISSIONER PEREZ:  Both of