21

1  them, very good.  Have you completed some

2  vocations within the institution that you would

3  be able to utilize?

4         INMATE ESCALANTE:  No, not here.

5         PRESIDING COMMISSIONER PEREZ:  Not here,

6  okay, but you have some experience as an

7  electrician and a plumber.

8         INMATE ESCALANTE:  Yes.

9         PRESIDING COMMISSIONER PEREZ:  And you

10 learned those skills from your father.

11        INMATE ESCALANTE:  Yes.

12        PRESIDING COMMISSIONER PEREZ:  And this

13 was where, in Honduras or here?

14        INMATE ESCALANTE:  Honduras.

15        PRESIDING COMMISSIONER PEREZ:  In

16 Honduras.  Okay.  Very good.  Sir, you have a

17 letter of support, right?

18        INMATE ESCALANTE:  Yes.

19        PRESIDING COMMISSIONER PEREZ:  Okay.  It

20 looks to me like you have several.  Let me read

21 into the record the first one, the one that was

22 provided by your counsel, and this is your

23 niece.

24        INMATE ESCALANTE:  My niece, yes.

25        PRESIDING COMMISSIONER PEREZ:  Carla

26 Figueroa, right.  This letter is dated December

27 4th, 2005.  Now, she lives where, in Honduras?

22

1        INMATE ESCALANTE:  No.  She lives in

2   Canoga Park.

3        PRESIDING COMMISSIONER PEREZ:  She lives

4   in Canoga.  Where is it, Canoga Park?

5        INMATE ESCALANTE:  Yes.

6        PRESIDING COMMISSIONER PEREZ:  Okay.  The

7   letter, this letter, again, is from your niece,

8   and she, in the letter she does convey her

9   support for you, and she further states,

10            "I would like to ask you to

11            consider his good conduct in all

12            these years he has been in there

13            and give him his freedom back.  He

14            is a good man, and I am willing to

15            help him in any way that I can."

16   Right.  And then we have another letter from

17   David Jonathon Escalante, and he is your

18   brother.

19        INMATE ESCALANTE:  My brother, younger

20   brother.

21        PRESIDING COMMISSIONER PEREZ:  And he

22   lives where?  Where does he live?

23        INMATE ESCALANTE:  Honduras.

24        PRESIDING COMMISSIONER PEREZ:  Honduras.

25   Okay.  And this letter is dated May 5th, 2005.

26   In the letter he writes,

27            "I wish to inform you that prison,

23

1        that my brother is in prison, and

2        I would like to plead to you if

3        he, if one day he were to come

4        back to Honduras, he would be

5        living in his own house beside me

6        and my family which would be,

7        which and we would be waiting for

8        him with open arms."

9  Now, does your brother own a couple of houses?

10        INMATE ESCALANTE:  Yeah.

11        PRESIDING COMMISSIONER PEREZ:  Okay.  One

12  of them is right next door to the home that he

13  lives?

14        INMATE ESCALANTE:  Yeah.

15        PRESIDING COMMISSIONER PEREZ:  Okay.  So

16  that is the one that you would live in?

17        INMATE ESCALANTE:  Yes.

18        PRESIDING COMMISSIONER PEREZ:  Okay.

19  Very good.  And then we have another letter, and

20  this is from Juan Dela Guzvonsaka (phonetic)

21  (indiscernible).

22        INMATE ESCALANTE:  (Indiscernible.)

23        PRESIDING COMMISSIONER PEREZ:  And what

24  is that?

25        INMATE ESCALANTE:  It's a college

26  building.  He owns it, and he got work for me

27  over there.

24

1    PRESIDING COMMISSIONER PEREZ:  And he's

2  got work for you.

3    INMATE ESCALANTE:  Yes.

4    PRESIDING COMMISSIONER PEREZ:  Okay.  So

5  it's an institution of higher learning.

6    INMATE ESCALANTE:  It's like a college

7  place.

8    PRESIDING COMMISSIONER PEREZ:  A college

9  place.

10    INMATE ESCALANTE:  Yeah.  He bought the

11  building, and he rent it for.

12    PRESIDING COMMISSIONER PEREZ:  Oh, I see,

13  I see.  Okay.  So he owns the building.

14    INMATE ESCALANTE:  He owns the building.

15    PRESIDING COMMISSIONER PEREZ:  Where

16  education is offered.

17    INMATE ESCALANTE:  Yes.

18    PRESIDING COMMISSIONER PEREZ:  In the

19  letter he writes, I wish to give this friend —

20  he's a friend of yours.

21    INMATE ESCALANTE:  Yes.

22    PRESIDING COMMISSIONER PEREZ:  You've

23  known him for years.

24    INMATE ESCALANTE:  Yeah.  When I was a

25  little boy over there.

26    PRESIDING COMMISSIONER PEREZ:  Over

27  there.  Okay.

25

1       "I would like to give this friend

2       the opportunity to make a better

3       person by offering him a job as an

4       English teacher for my school as

5       well as other management duties

6       that he knows, by which I will be

7       paying him 421 dollars."

8  Right?

9       **INMATE ESCALANTE:**  Yes.

10      **PRESIDING COMMISSIONER PEREZ:**  Is it

11  8,000 (indiscernible), or what are they?

12      **INMATE ESCALANTE:**  Lempiras.

13      **PRESIDING COMMISSIONER PEREZ:**  What is

14  it?

15      **INMATE ESCALANTE:**  Lempiras.

16      **PRESIDING COMMISSIONER PEREZ:**  Lempiras.

17  Okay.  A month which equates 421 dollars a

18  month.

19      **INMATE ESCALANTE:**  Yes.

20      **PRESIDING COMMISSIONER PEREZ:**  And you

21  can make a living on 421 dollars a month in

22  Honduras?

23      **INMATE ESCALANTE:**  Yes.

24      **PRESIDING COMMISSIONER PEREZ:**  Okay.

25  It's a lot less expensive than here, right?

26      **INMATE ESCALANTE:**  Yeah, it is.

27      **PRESIDING COMMISSIONER PEREZ:**  Sir, are

26

1    there any other letters of support, offers of

2    -- what I'm looking for mainly is offers of

3    employment or offers of residence.  Are there

4    any other?

5          **INMATE ESCALANTE:**  That's the only one I

6    have.

7          **PRESIDING COMMISSIONER PEREZ:**  Pardon me?

8          **INMATE ESCALANTE:**  That's the only one I

9    have.

10          **PRESIDING COMMISSIONER PEREZ:**  That's the

11    only one you have.

12          **INMATE ESCALANTE:**  Yeah.

13          **PRESIDING COMMISSIONER PEREZ:**  Okay.  So

14    we've already entered into the record everything

15    about your parole plans, right?

16          **INMATE ESCALANTE:**  Yes.

17          **PRESIDING COMMISSIONER PEREZ:**  Okay.

18    Very good.  Sir, pursuant to Penal Code Section

19    3042, notices were sent to agencies that would

20    have a direct interest in your case, such as the

21    Public Defenders Office, law enforcement, and

22    Superior Court, and the District Attorney's

23    Office.  And I note that although we didn't get

24    anything in writing from any of those entities,

25    we do have the District Attorney from Los

26    Angeles County who will be making a statement

27    prior to the conclusion of this hearing.  Okay.

27

1    At this time, Commissioner Morris will discuss

2    with you what you've been doing within the

3    institutions.  Okay.

4         **DEPUTY COMMISSIONER MORRIS:**  Okay.  Mr.

5    Escalante, your last hearing was May 27th of

6    '03.

7         **INMATE ESCALANTE:**  Yeah.

8         **DEPUTY COMMISSIONER MORRIS:**  And at that

9    time you had a two-year denial.

10        **INMATE ESCALANTE:**  Yes.

11        **DEPUTY COMMISSIONER MORRIS:**  Okay.  It

12   looks like you were received 4/18 of '91, and

13   I'll just kind of quickly go through your

14   movement through the institution here since you

15   were received at CCI Reception Center.  That's

16   April 18 of '91.  On June of '91, you were

17   transferred to Pelican Bay.  In July of '93, you

18   were transferred to State Prison, Los Angeles

19   County.  So you were down there for the opening

20   of that one.

21        **INMATE ESCALANTE:**  Yeah.  Lancaster.

22        **DEPUTY COMMISSIONER MORRIS:**  And it looks

23   like October 9 of '97, you were transferred to,

24   is it Ironwood State Prison.  And on 7/8 of '98,

25   you were transferred here, CTF, and that's where

26   you -- okay, you've been here since '98.

27        **INMATE ESCALANTE:**  Yes.

28

1    **DEPUTY COMMISSIONER MORRIS:**  Okay.  As I

2  go through the file, I see several chronos

3  talking about various Adult Basic Education test

4  scores.  I see a test score of 5.0, 6.4, 6.7.  I

5  also see a GED that you earned dated October 13

6  of 2000.

7    **INMATE ESCALANTE:**  Yes.

8    **DEPUTY COMMISSIONER MORRIS:**  Okay.  With

9  that GED completed, have you been able to

10  participate in or complete any vocational

11  programs?

12    **INMATE ESCALANTE:**  No.  They got me on

13  the waiting list.

14    **DEPUTY COMMISSIONER MORRIS:**  Okay.  Since

15  1991?

16    **INMATE ESCALANTE:**  Yes.

17    **DEPUTY COMMISSIONER MORRIS:**  Okay.  I see

18  that you're on the bulk computer waitlist.  I

19  saw that.  I saw machine shop waitlist.

20    **INMATE ESCALANTE:**  Yes.

21    **DEPUTY COMMISSIONER MORRIS:**  What's the

22  bar to getting in?  What's the problem?  Why

23  can't you get into a vocation?

24    **INMATE ESCALANTE:**  You got to wait

25  because the list is long.

26    **DEPUTY COMMISSIONER MORRIS:**  Well, we're

27  talking 14 years down the road now.

29

1      **INMATE ESCALANTE:** No.  I'm on the

2   waiting list since after I got my GED.

3      **DEPUTY COMMISSIONER MORRIS:** Okay.  In

4   2000.

5      **INMATE ESCALANTE:** Yes.

6      **DEPUTY COMMISSIONER MORRIS:** Okay.

7   That's right.  So you were not eligible until

8   you got the GED.

9      **INMATE ESCALANTE:** Right.

10      **DEPUTY COMMISSIONER MORRIS:** Okay.  Now,

11   as I review your C-File, I also see that you

12   were involved in those ABE classes all through

13   the '90s.

14      **INMATE ESCALANTE:** Yes.

15      **DEPUTY COMMISSIONER MORRIS:** Okay.  And

16   that got you to the point where you could pass

17   your GED.  After that, what did you do?  What

18   are you doing now?  Are you working anywhere?

19      **INMATE ESCALANTE:** I'm working on the

20   Chapel, Catholic Chapel.

21      **DEPUTY COMMISSIONER MORRIS:** Say that

22   again slowly.

23      **INMATE ESCALANTE:** Catholic Chapel.

24      **DEPUTY COMMISSIONER MORRIS:** Are you a

25   clerk over there?

26      **INMATE ESCALANTE:** No.  I'm the porter.

27      **DEPUTY COMMISSIONER MORRIS:** Porter?

30

1          **INMATE ESCALANTE:**  Yes.

2          **DEPUTY COMMISSIONER MORRIS:**  And when did

3  you become a porter?

4          **INMATE ESCALANTE:**  Right after I got my

5  GED.

6          **DEPUTY COMMISSIONER MORRIS:**  So you've

7  been a porter since --

8          **INMATE ESCALANTE:**  In 2000, December

9  2000.

10          **DEPUTY COMMISSIONER MORRIS:**  In 2000,

11  December 2000?

12          **INMATE ESCALANTE:**  Yeah.

13          **DEPUTY COMMISSIONER MORRIS:**  So all of

14  2003 through today.

15          **INMATE ESCALANTE:**  Yes.

16          **DEPUTY COMMISSIONER MORRIS:**  Okay.  And

17  can I assume that your supervisory work reports

18  are satisfactory?

19          **INMATE ESCALANTE:**  Yeah.

20          **DEPUTY COMMISSIONER MORRIS:**  Huh?

21          **INMATE ESCALANTE:**  Yes.  I have some.

22          **ATTORNEY HURST:**  Under notices and

23  responses there is actually a letter.

24          **DEPUTY COMMISSIONER MORRIS:**  I don't see

25  it.  I see '98, '98, Catholic Chapel,

26  (indiscernible) George Martin.

27          **INMATE ESCALANTE:**  Yeah.

31

1    DEPUTY COMMISSIONER MORRIS:  Is that who

2  you work for?

3    INMATE ESCALANTE:  No.  Now, I work for

4  Chaplain Christine.

5    DEPUTY COMMISSIONER MORRIS:  Okay.  I see

6  a chrono dated 4/11 of 2003, with exceptional

7  reports.  Before that, I see you were - it looks

8  like you tried machine shop, a machine or

9  something like that.  What happened with that?

10    INMATE ESCALANTE:  I was moved here.  I

11  was in North (indiscernible).

12    DEPUTY COMMISSIONER MORRIS:  That's

13  right, North.  They had a class for you at

14  North, but you had to move out of there.

15    INMATE ESCALANTE:  Yeah.  I think the

16  class was closed.

17    DEPUTY COMMISSIONER MORRIS:  Okay.  In

18  2000, you were at North.  Catholic Chapel, with

19  satisfactory work reports, and the only other

20  chrono I see after that -- that's the last

21  chrono.

22    INMATE ESCALANTE:  I have one from

23  Christine, my new boss Christine Manyamana

24  (phonetic).

25    DEPUTY COMMISSIONER MORRIS:  Okay.  And

26  what does she say about you?

27    INMATE ESCALANTE:  There's a letter

32

1  there.  I haven't read it yet.

2      **DEPUTY COMMISSIONER MORRIS:**  Did she give

3  it to you?

4      **ATTORNEY HURST:**  Here, it's under notices

5  and responses rather than a chrono.

6      **DEPUTY COMMISSIONER MORRIS:**  Then why

7  would it go to the file if you haven't seen it,

8  you don't know anything about it?

9      **INMATE ESCALANTE:**  Yeah.  I put them in

10  the file there.

11      **DEPUTY COMMISSIONER MORRIS:**  The question

12  is what do you know about it?

13      **INMATE ESCALANTE:**  No.  She asked me

14  about my –

15      **DEPUTY COMMISSIONER MORRIS:**  Talk to me

16  now.  I'm asking you about your last supervisory

17  report.  That's who you work for now, right?

18      **INMATE ESCALANTE:**  Yeah.

19      **DEPUTY COMMISSIONER MORRIS:**  Christine?

20      **INMATE ESCALANTE:**  Yeah, Christine.

21      **DEPUTY COMMISSIONER MORRIS:**  What does

22  Christine say about you?

23      **INMATE ESCALANTE:**  It's right there.

24      **DEPUTY COMMISSIONER MORRIS:**  I'm asking

25  you.

26      **PRESIDING COMMISSIONER PEREZ:**  Did you

27  read the letter?

33

1        **INMATE ESCALANTE:**  No.  I don't have it.

2        **DEPUTY COMMISSIONER MORRIS:**  Okay.  See,

3   I don't understand how you could possibly have

4   something in your file that you don't know

5   about.  That's suspicious to me.  It doesn't

6   sound right.  March 10 of '05, March 10 of '05.

7   Okay.  All right.  Does anyone else have any

8   good things to say about you?

9        **INMATE ESCALANTE:**  No.

10       **DEPUTY COMMISSIONER MORRIS:**  Okay.  And

11  as I indicated, that chrono is not in the file,

12  so what do -- do you know what you need to do

13  with that?

14       **INMATE ESCALANTE:**  No.

15       **DEPUTY COMMISSIONER MORRIS:**  You said

16  you've given, have you given it to your

17  counselor?

18       **INMATE ESCALANTE:**  Yeah.

19       **DEPUTY COMMISSIONER MORRIS:**  Okay.  So

20  the counselor is going to see that it gets to

21  the file maybe.

22       **INMATE ESCALANTE:**  Yeah.  That in the

23  file.

24       **DEPUTY COMMISSIONER MORRIS:**  But before

25  he does that, hopefully, you'll read it before

26  you -- you need to know what goes in your file.

27  Have you ever reviewed your file?

34

1      **INMATE ESCALANTE:** Yeah, I did.

2      **DEPUTY COMMISSIONER MORRIS:** Okay.

3      **ATTORNEY HURST:** Commissioner Morris.

4      **DEPUTY COMMISSIONER MORRIS:** Yes.

5      **ATTORNEY HURST:** I'm just noting -- this

6 is the notes that I took from the C-File, not

7 from this file but from the C-File, and I did

8 note it, so it would appear that I found it

9 somewhere in the C-File.

10     **DEPUTY COMMISSIONER MORRIS:** Okay.

11     **ATTORNEY HURST:** At that time.

12     **DEPUTY COMMISSIONER MORRIS:** Okay.

13     **ATTORNEY HURST:** Which was about two and

14 a half weeks ago.

15     **DEPUTY COMMISSIONER MORRIS:** Okay. Well,

16 it's not where it's supposed to be today.  It

17 should be right here.  I may run across it by

18 and by, but it's not where it's supposed to be,

19 and these things are listed in chronological

20 order.

21     **ATTORNEY HURST:** Well, I don't think it

22 was filed as a chrono but either in

23 miscellaneous or back in parole.

24     **DEPUTY COMMISSIONER MORRIS:** Maybe it's a

25 general chrono or something, but it's not, it's

26 not as a supervisory work report which is what

27 I'm looking at right now.

35

1        **ATTORNEY HURST:**  Right.  You're right.

2        **DEPUTY COMMISSIONER MORRIS:**  It may be a

3    different document.  Okay.  We'll get there.

4    Okay.  That chapel porter, is that a pay number?

5        **INMATE ESCALANTE:**  Yes.

6        **DEPUTY COMMISSIONER MORRIS:**  Okay.  And

7    what do you earn there?

8        **INMATE ESCALANTE:**  Twenty dollar.

9        **DEPUTY COMMISSIONER MORRIS:**  Okay.  All

10   right.  Anything else about your work or

11   vocations that we need to talk about?  Did we

12   miss anything?

13       **INMATE ESCALANTE:**  No.

14       **DEPUTY COMMISSIONER MORRIS:**  Okay.  All

15   right.  Let me, let me ask you about self-help,

16   and I notice that you've got alcohol, marijuana,

17   cocaine in your history, and I see a number of

18   chronos in your file it seems like from about

19   1995 through '04, with through '05, chronos

20   talking about AA participation.  So you've

21   participated?

22       **INMATE ESCALANTE:**  Yeah.

23       **DEPUTY COMMISSIONER MORRIS:**  With some

24   regularity?

25       **INMATE ESCALANTE:**  Well, you know, once

26   in a while if you wish you talk, you can get up.

27       **DEPUTY COMMISSIONER MORRIS:**  Okay.  Have

36

1    you learned anything about the 12 Steps?

2         INMATE ESCALANTE:  Yeah.

3         DEPUTY COMMISSIONER MORRIS:  What's

4    Number Nine?

5         INMATE ESCALANTE:  Huh?  Number Nine?

6    Made direct amends to such people except when to

7    do so would injure them or others.

8         DEPUTY COMMISSIONER MORRIS:  Okay.  Good.

9    I also see that you've taken some classes.  This

10   goes back way before your last hearing, but I'm

11   just going to bring it forward anyway.  You took

12   some health classes, health care classes, having

13   to do with HIV, AIDS, TB, sexually transmitted

14   disease, Tuberculosis, those kind of things, and

15   that was in '02.

16        INMATE ESCALANTE:  Yes.

17        DEPUTY COMMISSIONER MORRIS:  And I see in

18   '05, the only thing I see in terms of

19   participating in anything is the soccer league.

20   Have you done anything else besides the soccer

21   league?

22        INMATE ESCALANTE:  Well, I've done Anger

23   Management.  I've done the Impact Program.

24        DEPUTY COMMISSIONER MORRIS:  What year

25   did you -- you did Anger Management in '05, this

26   year?

27        INMATE ESCALANTE:  No, no, not this year.

37

1          **DEPUTY COMMISSIONER MORRIS:**  Okay.  What

2     else have you done since?

3          **INMATE ESCALANTE:**  I just go to the

4     regular meetings.

5          **DEPUTY COMMISSIONER MORRIS:**  What else

6     have you done besides AA in '03?

7          **INMATE ESCALANTE:**  AA and NA.

8          **DEPUTY COMMISSIONER MORRIS:**  Okay.  So

9     just AA.

10          **INMATE ESCALANTE:**  Yes.

11          **DEPUTY COMMISSIONER MORRIS:**  Okay.

12          **INMATE ESCALANTE:**  And NA.

13          **DEPUTY COMMISSIONER MORRIS:**  AA and NA.

14     Right.  All right.  All right.  Let me move on

15     to the psych report.  Okay.  I'm looking at a

16     mental health evaluation dated December 7 of

17     '05.  This document is authored by, it looks

18     like Petracek, the contract psychologist, and

19     I'm looking at diagnosis here on page three.

20     It's the second section from the bottom.  Under

21     Axis I, you're listed as Poly-substance Abuse,

22     as having Poly-substance Abuse by History and

23     that is in Institutional Remission; Axis II is

24     Deferred; Axis III, None; Axis IV is

25     Psychosocial Stressors to Include Incarceration;

26     Axis V, the Global Assessment Functioning test,

27     commonly called a GAF Score is 75.  I'm looking

1    at assessment of dangerousness, and Petracek

2    indicates that within a controlled setting your

3    risk is minimal.  If released in the community,

4    the risk is -- or if released into the

5    community, the risk is also minimal.

6    Significant risk factors, precursors to

7    violence, are his past alcohol and substance

8    abuse, and relapse would increase his risk of

9    violence, risk for violence and due to gains he

10   has made, he has not received any CDC 115s and

11   has matured since being incarcerated.  Under

12   comments and recommendations, she goes on to say

13   that if paroled you should be mandated to attend

14   both NA, AA and have frequent, periodic drug

15   testing for alcohol and illegal substances.  She

16   says that this inmate's still denies any

17   responsibility for his crime.  He needs to

18   develop some insight or reasonable explanation

19   before being considered for parole.  Those

20   comments were authored by Petracek.  And having

21   heard that, do you take exception to any part of

22   that, or do you agree with that?

23        **INMATE ESCALANTE:**  Agree with what?

24        **DEPUTY COMMISSIONER MORRIS:**  Anything

25   that she just said about you, do you take

26   exception to any of that, or is it pretty much

27   right on?

39

1          INMATE ESCALANTE:  It's all right.

2          DEPUTY COMMISSIONER MORRIS:  It's okay?

3          INMATE ESCALANTE:  It's okay.

4          DEPUTY COMMISSIONER MORRIS:  Okay.  All

5     right.  Is there anything else we need to talk

6     about, about your post-conviction factors that,

7     post-conviction factors that I missed?

8          INMATE ESCALANTE:  No.

9          DEPUTY COMMISSIONER MORRIS:  Okay.  I

10    yield it to the Chair.

11         PRESIDING COMMISSIONER PEREZ:  Thank you.

12    At this time, I would like to give the DA the

13    opportunity to ask questions through the Chair,

14    please.

15         DEPUTY DISTRICT ATTORNEY DELAVIGNE:  No

16    questions.

17         PRESIDING COMMISSIONER PEREZ:  Counsel.

18         ATTORNEY HURST:  No questions.

19         PRESIDING COMMISSIONER PEREZ:  Mr.

20    Morris.

21         DEPUTY COMMISSIONER MORRIS:  None.

22         PRESIDING COMMISSIONER PEREZ:  Closing

23    statement, please.

24         DEPUTY DISTRICT ATTORNEY DELAVIGNE:  I

25    have nothing to address.  Until the inmate gains

26    some insight into what he did and makes some

27    comment about it, I have nothing to say except

40

1   to oppose a finding of suitability.

2           **PRESIDING COMMISSIONER PEREZ:**   Thank you.

3   Counsel.

4           **ATTORNEY HURST:**   Okay.   I don't have a

5   lot to say either.   Mr. Escalante's position on

6   the life crime has been placed on the record

7   before, and we know you have to accept the

8   conviction, and he's been down nearly 15 years

9   on this crime, so he's doing the time for it.

10  And he's done quite a good job certainly in the

11  area of disciplinaries, no 115s at all.   That's

12  not really easy.   He's in the broad areas of

13  educational and vocational upgrading.   He has

14  achieved his GED in the year 2000, and he's

15  currently on several waiting lists.   He did

16  state to you that he has plumbing and electrical

17  experience in the past.   Self-help, there has

18  been some.   There has been the Impact Program

19  and continued participation in AA and NA.   The

20  most recent psych report, I'm not really sure

21  what that report says.   It says that he is a

22  minimal risk if he's released to the community

23  which I would assume is what we're looking for.

24  That is what we're looking for today, and she

25  notes he has no 115s, and he has matured.   On

26  the other hand, she questions his insight if he

27  committed the crime, and he has been convicted

41

1   of it, then he may be lacking in insight.  If he

2   didn't, of course, he's lacking in knowledge of

3   it.  So I can understand the doctor doesn't have

4   too many choices in her conclusion there.  He

5   does have parole plans though, and very much to

6   his credit, he has developed dual parole plans

7   so that he would have a place to live if he

8   remains in the United States and a place to live

9   and work if he is deported.  So he's made some

10  preparation.  I think he's serious about

11  preparing himself.  I just ask you to consider

12  the positive things he's accomplished.  Submit

13  it.

14          **PRESIDING COMMISSIONER PEREZ:**  All right.

15  Thank you.  Sir, this is your opportunity to

16  provide a statement to the Panel regarding your

17  suitability for parole.  Tell us why you feel

18  that you are suitable for parole.

19          **INMATE ESCALANTE:**  First of all, I wish

20  an apology to the victim and the victim's

21  family, and the People of California, also, my

22  family, and say I'm not a threat to public

23  safety, and I'm a changed person.

24          **PRESIDING COMMISSIONER PEREZ:**  Thank you,

25  sir.  We will now recess for deliberations.  The

26  time is 4:44 p.m.

27                  **R E C E S S**

42

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3      **DEPUTY COMMISSIONER MORRIS:**   Back on

4   record.

5      **PRESIDING COMMISSIONER PEREZ:**   Sir, the

6   Panel has reviewed all the information received

7   from the public and relied on the following

8   circumstances in concluding that you are not

9   suitable for parole and that you would pose an

10  unreasonable risk of danger to society or a

11  threat to public safety if released from prison

12  at this time.   Sir, one of the main factors that

13  we took into consideration is the gravity of the

14  offense in that after reviewing the facts of

15  this crime, it is the opinion of this Panel that

16  the offense was carried out in an especially

17  cruel and callous manner in that the victim was

18  hit and kicked and knocked to the ground.   Once

19  he was on the ground, the record reflects that

20  you grabbed him by the hair and stabbed him in

21  the eye resulting in the loss, permanent loss,

22  of sight in that particular eye as well as a

23  frontal lobotomy.   The offense was carried out

24  in a dispassionate and calculated manner in that

25  the record reflects that you asked to borrow the

26  victim's car.   When he refused, you left.   You

27  **JUSTO ESCALANTE   E-91258   DEC. PAGE 1    12/15/05**

43

1   returned with three of your friends.  You waited

2   for the victim to come back to his vehicle, and

3   it is at that point that he was attacked and

4   stabbed.  The offense was carried out in a

5   manner which demonstrates an exceptionally

6   callous disregard for human suffering in that it

7   is unimaginable the physical and emotional

8   trauma this victim endured during the beating as

9   well as the physical and emotionally, mental

10  issues that he will endure for the rest of his

11  life as a result of having permanent loss of

12  sight in one eye as well as a frontal lobotomy

13  and that the negative effects that go with that.

14  Sir, these conclusions are drawn from the

15  Statement of Facts wherein according to the

16  record, on September 10th, 1990, at

17  approximately 4:20 p.m. you got in an argument.

18  You and the victim were involved in an argument.

19  You wanted to borrow the victim's car.  He

20  refused.  You left.  You came back with your

21  friends.  You and your friends started hitting

22  and kicking the victim.  When the victim was

23  down, you struck the victim in the eye with a

24  knife penetrating the brain.  The other factor

25  that we took into consideration, sir, is that

26  you entered this country in approximately 1984,

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 2   12/15/05**

44

1  and four years later, you were already

2  entrenched in the criminal, in criminal

3  activities in that you were arrested on a number

4  of occasions prior to the commitment offense for

5  drug-related offenses to include transportation

6  and sales of narcotics and controlled substance,

7  murder, possession of a firearm, grand theft

8  vehicle, possession of narcotic, controlled

9  substance, possession of bad checks and money

10  orders.  One of those offenses resulted in a

11  conviction for which you were sentenced, a

12  felony conviction for which you were sentenced

13  to 180 days in jail, fined, and 36 months

14  probation.  We note for the record that prior to

15  the commitment offense you had failed to profit

16  from society's previous attempts to correct your

17  criminality.  Such attempts include adult

18  probation and county jail, again, for

19  transportation and sales of controlled

20  substance.  The record reflects that you have an

21  unstable social history and prior criminality as

22  previously outlined which includes the arrest

23  and, or convictions that were previously noted

24  to include the use of marijuana and cocaine.

25  Sir, since you've been incarcerated, you have

26  programmed in a limited manner.  You are to be

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 3    12/15/05**

45

1    commended for not having incurred any 115s

2    throughout your entire incarceration.  However,

3    the record reflects that you have not completed

4    any vocations throughout the entire time that

5    you have been in prison.  And although you have

6    taken advantage of some self-help programs

7    within the institution, sir, you have not

8    sufficiently participated in beneficial self-

9    help specifically to address the issue of

10   insight.  The most recent psychological report,

11   sir, that was also taken into consideration is

12   somewhat contradictory but at the same time it

13   is not totally supportive of release.  This

14   particular report was prepared by Contract

15   Psychologist Laura Petracek, P-E-T-R-A-C-E-K,

16   dated December 8th, 2005, in which she indicates

17   that you your risk if released to the community

18   is minimal; however, she further states this

19   inmate still denies any responsibility for his

20   crime.  He needs to develop some insight or

21   reasonable explanation before being considered

22   for parole.  Sir, in a separate decision the

23   Hearing Panel notes that you have been convicted

24   of aggravated mayhem with use of a deadly

25   weapon, specifically a knife.  As such, it would

26   not be reasonable to expect that you would be

27   **JUSTO ESCALANTE   E-91258   DEC. PAGE 4   12/15/05**

46

1  granted parole during the next two years.  So as

2  a result, sir, we're going to deny you for two

3  years.  Again, one of the main reasons is the

4  gravity of the offense in that it is the opinion

5  of this Panel after reviewing the facts of this

6  crime the offense was carried out in an

7  especially cruel and callous manner in that the

8  victim was hit, kicked, knocked to the ground.

9  Once he was on the ground, you grabbed him by

10  the hair, and you proceeded to stab him in the

11  eye, and that stab wound penetrated into his

12  brain resulting in permanent loss of sight in

13  his eye as well as a frontal lobotomy.  The

14  offense was carried out in a dispassionate and

15  calculated manner in that the record reflects

16  that you initially approached the victim.  You

17  asked him to use his, to borrow his car.  He

18  refused.  You left.  You went got three of your

19  friends.  You came back.  You waited by the

20  vehicle, and then when the victim came out

21  towards his vehicle, you and your friends

22  proceeded to attack him, and once he hit the

23  ground, you grabbed him by the hair, and you

24  stabbed him in the eye, penetrating that knife

25  into his brain.  The offense was carried out in

26  a manner which demonstrates an exceptionally

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 5  12/15/05**

47

1    callous disregard for human suffering in that it

2    is unimaginable the physical and emotional

3    trauma that this individual endured at the time

4    of the offense and will endure for the remainder

5    of his life as a result of the problems that he

6    will encounter as a result of the permanent loss

7    of sight in one eye and the frontal lobotomy,

8    the problems that go with a frontal lobotomy.

9    These conclusions are drawn from the Statement

10   of Facts wherein according to the record on

11   September 10th, 1990, you got in an argument

12   with the victim.  You and the victim were

13   involved in an argument because you wanted to

14   use his car.  He refused to lend it to you.  You

15   went and got your friends.  You returned, and

16   when the victim came out of his residence, the

17   residence that he was visiting and approached

18   his vehicle, you and your friends proceeded to

19   attack him with you grabbing him by the hair

20   once he was on the ground and stabbing him in

21   the eye penetrating into the brain resulting in

22   permanent loss of sight in his right eye and a

23   frontal lobotomy.  The other factor that we took

24   into consideration in this multi-year denial is

25   the fact that you entered this country in 1984,

26   and four years later you were already entrenched

27   **JUSTO ESCALANTE   E-91258   DEC. PAGE 6    12/15/05**

48

1   in criminal activities, specifically,

2   transporting, transportation and sales of

3   controlled substance in that the record reflects

4   that you have been convicted on a number of

5   occasions for transporting, sales of controlled

6   substance resulting in one conviction in that

7   you were placed on adult probation in which you

8   were assessed county jail time.  The record also

9   reflects that you have other arrests and, or

10  convictions, or detentions for transportation,

11  several for transportation and sales of

12  controlled substance, murder, (indiscernible),

13  possession of a firearm, grand theft vehicle, as

14  well as possession of bad checks, and possession

15  of narcotics and controlled substances.  The

16  record also reflects that you have a history of

17  using illicit substances as well as selling

18  them, specifically, marijuana and cocaine.

19  Again, we do note that it is the opinion of this

20  Panel based on a review of the record that you

21  have not sufficiently participated in beneficial

22  self-help, specifically, to address the issue of

23  insight.  In addition, sir, although you have

24  been involved in some self-help within the

25  institutions, the record does not reflect that

26  you have completed any vocations during the

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 7   12/15/05**

49

1  entire time that you have been incarcerated.

2  Again, the most recent psychological report is

3  not totally supportive of release, and

4  furthermore, it is somewhat contradictory in

5  that it indicates that if you were to be

6  released to the community, your risk would be

7  minimal.  However, the doctor firmly states that

8  any, that you deny any responsibility and that

9  you need to develop some insight or at least a

10  reasonable explanation before being considered

11  for parole.  In terms of your parole plans, sir,

12  we do not for the record that you do have

13  realistic parole plans in that more likely than

14  not, given the circumstances under which you

15  were in this country, more likely than not you

16  would be deported to Honduras, and we do have

17  letters in your file that support your parole

18  plans to live with your brother and, or your

19  cousin upon your release to parole.  In

20  addition, sir, we do not find based on a review

21  of the record that you have a marketable skill,

22  at least not one that you have developed since

23  you've been incarcerated.  However, you have

24  indicated to this Panel that you have experience

25  as an electrician or a plumber.  That is

26  questionable.  Let me tell you why that is

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 8  12/15/05**

50

1    questionable. You came to this country when you

2    were 20 -- you committed the offense when you

3    were 21 years of age. You came to this country

4    four years earlier. That would put you at the

5    age of 17.

6            INMATE ESCALANTE: No. I was 26.

7            PRESIDING COMMISSIONER PEREZ: You were

8    26. Okay. When I said that, you should have

9    corrected me, sir. You were 26. So that means

10    -- you were 26 when you committed the offense?

11            INMATE ESCALANTE: Yes.

12            PRESIDING COMMISSIONER PEREZ: Or when

13    the offense was committed, which means that you

14    came to this country when you were 22.

15            INMATE ESCALANTE: About 22.

16            PRESIDING COMMISSIONER PEREZ: Twenty-

17    two. Okay. So I would imagine it would be

18    somewhat limited experience as an electrician or

19    a plumber in that you were about 22 at the time

20    you came to this country. That doesn't mean

21    that it's not possible that you have those

22    skills. I'm just saying that it seems like your

23    skills wouldn't be extensive in that you were

24    pretty young already when you came to this

25    country, and you indicated that you developed

26    those skills when you were in Honduras from your

27    **JUSTO ESCALANTE  E-91258  DEC. PAGE 9   12/15/05**

51

1  father. Sir, the Hearing Panel notes that

2  responses to Penal Code Section 3042 indicate an

3  opposition to a finding of parole suitability by

4  the District Attorney of Los Angeles County.

5  Sir, what year were you born?

6      INMATE ESCALANTE: March 26, '63.

7      PRESIDING COMMISSIONER PEREZ: Sixty-

8  three. Okay. The reason I say that is because

9  you gave me the impression that you were 21 is

10  that your rap sheet shows that you were born in

11  1969.

12      INMATE ESCALANTE: Sixty-three.

13      PRESIDING COMMISSIONER PEREZ: But your

14  rap sheet also shows that you were born in 1963,

15  and your rap sheet shows that you were born in

16  1970, and then your rap sheet again shows us

17  another birth date in 1963. My assumption was

18  you were born in 1969. As indicated, you were

19  born in 1963. Right?

20      INMATE ESCALANTE: I've got a birth

21  certificate.

22      PRESIDING COMMISSIONER PEREZ: Okay. So

23  that would make you about 42.

24      INMATE ESCALANTE: Forty-two.

25      PRESIDING COMMISSIONER PEREZ: Forty-two.

26  Okay. Very good. Sir, the Panel makes the

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 10  12/15/05**

52

1  following findings, and that is that you need to

2  participate in more self-help and, or therapy in

3  order to help you come to terms with the

4  underlying cause of the commitment offense in

5  that even though you are not required to discuss

6  or admit to the commitment offense, you still

7  need to be able to demonstrate some sort of

8  insight when you come before this Panel, and you

9  have not done that today.  You have really not

10  done that.  And until progress is made, it is

11  the opinion of this Panel that you will continue

12  to be unpredictable and a threat to others.

13  Nevertheless, sir, we would like to take this

14  opportunity to commend you for not having

15  received any 115s throughout the entire time

16  that you have been incarcerated.  That's very

17  commendable.  We understand that it can be

18  difficult for you to maneuver through these

19  shark-infested waters within the institution

20  without incurring any 115s, so we certainly

21  commend you for having the ability and the skill

22  to not incur any disciplinaries while within the

23  institutions.  Sir, we'd also like to commend

24  you for the multiple laudatory chronos in your

25  file as well as for your continued participation

26  in AA, NA; however, sir, these positive aspects

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 11  12/15/05**

53

1   of your behavior do not outweigh the factors of

2   unsuitability.  As a result, we're going to deny

3   you for two years.  In the meantime, we make the

4   following recommendations.  We recommend, if

5   you're able to do so, you complete at least one

6   trade during the next two years.  I imagine

7   that's the only thing you could complete within

8   the next two years if you were to be placed in a

9   trade this moment because a lot of those trades

10  do take about two years or so on the average.

11  So if you're able to get into a trade, do that,

12  and if you're able to complete it before you

13  come before the Board in two years, we would

14  certainly (indiscernible) that.

15       **DEPUTY COMMISSIONER MORRIS:**  I'm turning

16  the tape over.

17       [Thereupon, the tape was turned over.]

18       **DEPUTY COMMISSIONER MORRIS:**  We're back

19  on record.

20       **PRESIDING COMMISSIONER PEREZ:**  And we

21  recognize that.  We recognize that.  You got

22  your GED in 2000, and we certainly commend you

23  for that, and we recognize that until you either

24  get your GED or reach a certain grade point

25  level that they won't consider you for

26  vocations, so we understand that.  What we're

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 12  12/15/05**

54

1   saying is if you're able to do it, and you said

2   you are on the waiting list, so if you're able

3   to get into one of those vocations we would

4   encourage you to take advantage of it and do it.

5   Also, take advantage, immerse yourself in any

6   and all self-help that might be available within

7   the institutions.  If there is nothing

8   available, then we would recommend that you go

9   to the library or talk to your counselor or

10  other individuals within the institution that

11  might have resources, if they could point you to

12  so that you can do some self study.  Okay.  Do

13  you know what I mean by self study?

14          INMATE ESCALANTE:  Right.

15          PRESIDING COMMISSIONER PEREZ:  If you do

16  some self study, bring in a book report and tell

17  us what you're learning next room to demonstrate

18  that you're being proactive, okay, in trying to

19  develop insight and learn a little bit more

20  about yourself so that once you're released to

21  parole you won't be involved in criminality.

22  Okay.  Also, we do recommend that you earn

23  positive chronos.  You have numerous positive

24  chronos or a number of positive chronos in your

25  file, but we recommend that if you're able to do

26  so, continue doing this good work that you've

27  **JUSTO ESCALANTE  E-91258  DEC. PAGE 13  12/15/05**

55

1  been doing so that you can get more laudatory

2  chronos placed in your file. And of course,

3  continue to remain disciplinary-free. You're

4  doing very well so far with no 115s. We

5  encourage you to continue in that same path.

6  But at the same time we do note that you do have

7  three 128s; 128s also affect you as well because

8  one of them is a little violation. The other is

9  bigger violation. Either way they're still

10  violations of institutional procedures, policy,

11  and so we recommend that you not incur any 115s

12  or 128s. Okay. Mr. Morris.

13      DEPUTY COMMISSIONER MORRIS: I think

14  you've covered everything, but Mr. Escalante

15  just let me just encourage you to follow up on

16  that machine shop. Okay.

17      INMATE ESCALANTE: I think the shop is

18  closed.

19      DEPUTY COMMISSIONER MORRIS: Pardon me?

20      INMATE ESCALANTE: The shop is closed.

21  It's over in North.

22      DEPUTY COMMISSIONER MORRIS: Okay.

23      INMATE ESCALANTE: I'm in Central right

24  here.

25      DEPUTY COMMISSIONER MORRIS: Okay.

26      INMATE ESCALANTE: We have here computer

27  JUSTO ESCALANTE  E-91258  DEC. PAGE 14  12/15/05

56

1  and print shop.  I am on the waiting list for

2  that.

3          **DEPUTY COMMISSIONER MORRIS:**  I think

4  you're going to find that if you make contact

5  with the supervisor of education programs that

6  there are more than two programs available at

7  the institution.  I find that hard to believe

8  that there are only two.  But be that as it may,

9  you check it out.  Do what you can to try to

10  complete one or at least be involved in it when

11  you come back here.  Okay.  Again, you're doing

12  a good job with the chronos, the laudatories.

13  Keep generating those.  You remain absolutely

14  disciplinary-free.  Those things will hurt you.

15  Okay.  The last negative chrono was in '98, so

16  you're doing a pretty good job with that.  Just

17  stay the course right there and continue to

18  participate in AA, NA, those kinds of things.

19  Okay.  That's it.

20  --

21  --

22  --

23  --

24  --

25  --

26  --

27  **JUSTO ESCALANTE   E-91258   DEC. PAGE 15   12/15/05**

57

1        **PRESIDING COMMISSIONER PEREZ:**  Sir, we do

2   wish you the best of luck.  This concludes this

3   hearing.  The time is 5:12 p.m.  Good luck, sir.

4                        --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON: Apr. 14, 2006

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   JUSTO ESCALANTE  E-91258  DEC. PAGE 16  12/15/05

58

CERTIFICATE AND

DECLARATION OF TRANSCRIBER


I, KRISTIN LEDBETTER, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 57, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF JUSTO ESCALANTE, CDC NO. E-91258, ON DECEMBER 15, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 31, 2005, at Sacramento, California.


KRISTIN LEDBETTER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT   B



FILED
Los Angeles Superior Court

OCT 0  2006

John A. Clarke, Executive Officer/Clerk

By: _____, Deputy

JOSEPH M. PULIDO, S.C.C.
233219

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,                                    )   Case No.: BH003993
                                          )
JUSTO ESCALANTE,                          )   ORDER RE: WRIT OF HABEAS CORPUS
                                          )
            Petitioner,                   )
                                          )
        On Habeas Corpus                  )
                                          )
_____)

The Court has read and considered petitioner's Writ of Habeas Corpus filed on April 28, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole. (See Cal. Code Regs., tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner is serving a term of 7 years to life with a minimum parole eligible date of May 29, 1998. Petitioner was convicted of aggravated mayhem with the use of a deadly weapon, in violation of Penal Code sections 205 and 12022(b). The record reflects that on September 10, 1990, petitioner entered into an argument with the victim over the victim's refusal to loan petitioner his car. Petitioner left the scene and returned with several friends. Petitioner and his friends started to hit and kick the victim and while the victim was down, petitioner stabbed the victim in the eye with a knife, which penetrated to the victim's brain. The victim suffered

EP

1

1  permanent loss of sight in his right eye and a frontal lobotomy was performed resulting in

2  permanent brain damage.

3       The record reflects that the Board found petitioner unsuitable for parole after a parole

4  consideration hearing held on December 15, 2005.  Petitioner was denied parole for two years.

5  The Board concluded that Petitioner was unsuitable for parole and would pose an unreasonable

6  risk of danger to society and a threat to public safety if released from prison.  The Board based

7  its decision on several factors, including his commitment offense.  The Court finds that there is

8  no evidence to support the Board's findings that the commitment offense was "dispassionate and

9  calculated," such as an execution-style murder (see Cal. Code Regs., tit. 15, § 2402, subd.

10  (c)(1)(B)) and that the "offense was carried out in a manner that demonstrates an exceptionally

11  callous disregard for human suffering" (see Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D).

12  Although there is no evidence to support the Board's specific findings regarding the commitment

13  offense, the Court nevertheless finds that there is some evidence that the commitment offense

14  was one in which the victim was abused, defiled or mutilated during or after the offense.  (See

15  Cal. Code Regs, tit. 15, § 2402, subd. (c)(1)C).)  "We may uphold the [Board's] decision, despite

16  a flaw in its findings, if the authority has made clear it would have reached the same decision

17  even absent the error."  (*In re Dannenberg* (2005) 34 Cal.4[th] 1061, 1100.)  Based on the fact that

18  the Board's discussion of the commitment offense cited to the petitioner hitting, kicking and

19  knocking the victim to the ground before stabbing him, the Court concludes that the Board's

20  mistake does not invalidate its decision to deny parole based on the commitment offense.

21       The record further reflects that the Board also relied on several additional factors in

22  denying petitioner parole at this time, and there is some evidence to support that decision.  The

23  Court finds that there is some evidence to support the Board's findings that petitioner is

24  unsuitable based on insufficient self-help and a lack of vocational programming and based on a

25  psychological evaluation that stated that the "inmate still denies any responsibility for the crime"

26  and needed to develop insight before being considered for parole.  The Board was acting within

27  its authority when it considered petitioner's various preconviction factors and postconviction

28

EP

1  gains, yet concluded that he would pose an unreasonable threat to public safety.  (See Pen. Code

2  § 3041, subd. (b).)

3          Therefore, the petition is denied.

4

5  October 2, 2006

6

7                                                    DAVID S. WESLEY

8                                                    Judge of the Superior Court

9

10

11  Clerk to give notice.

12

13  **Send copy of order to:**

14  Justo Escalante E-91258
    CTF Central, F-Wing 302
15  P.O. Box 689
    Soledad, CA 93960-0689

16

17

18

19

20

21

22

23

24

25

26

27

28

EP

3